## NOTICE: SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 4, 2021

_Gonzáles C.J._
_____
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 4, 2021

_Susan L. Carlson_

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 96365-7 |
| Respondent/Cross-Petitioner, | ) | (consol. w/ 96566-8) |
| | ) | |
| v. | ) | |
| | ) | En Banc |
| PHILLIP SCOTT NUMRICH, | ) | |
| | ) | |
| Petitioner/Cross-Respondent. | ) | |
| | ) | Filed: February 4, 2021 |
| _____ | ) | |

MADSEN, J.—At issue in this case is whether the general-specific rule applies to

a second degree manslaughter charge stemming from a workplace death. The State

initially charged Phillip Scott Numrich under the Washington Industrial Safety and

Health Act of 1973 (WISHA), RCW 49.17.190(3), the specific statute that punishes

employer conduct resulting in employee death. The State also charged the employer with

second degree manslaughter. The trial court denied the employer's motion to dismiss the

manslaughter charge based on the general-specific rule, and the employer sought and was

granted direct review. Specifically, we are asked whether the trial court properly denied

No. 96365-7 (consol. w/ 96566-8)

Numrich's motion to dismiss a second degree manslaughter charge when one of his employees was killed at the construction site.

While consideration of the employer's motion for direct discretionary review was pending, the State moved to amend the information to add an alternative charge of first degree manslaughter. The trial court granted the motion to amend but sua sponte imposed sanctions against the State based on the timing of the amendment. The employer sought review of the order granting the amendment and the State sought review of the order imposing sanctions. This court granted review and consolidated all the noted matters for consideration.

For the reasons discussed below, we hold that the trial court did not err in denying the employer's motion to dismiss the manslaughter charge under the general–specific rule. We further hold that the trial court did not err in granting the State's motion to amend the information to add an alternative first degree manslaughter charge. Finally, we hold that the trial court did not err in imposing sanctions on the State under the circumstances of this case. With these holdings, we remand to the trial court for further proceedings.

FACTS

Numrich is the owner and operator of Alki Construction LLC. Harold Felton was Numrich's employee. On January 16, 2016, Numrich's company began replacing a sewer line at a residence in West Seattle. Numrich employed a technique by which a trench is dug at either end of the residential sewer pipe to be replaced and then a

2

No. 96365-7 (consol. w/ 96566-8)

hydraulic machine is used to pull a new pipe through the old one, which simultaneously bursts the old pipe and inserts the new one into place.

In the present case, the trench that was dug where the sewer line connected to the house was 21 inches wide, 6 feet long, and 8 to 10 feet deep. With a trench of this depth, there is a substantial risk that the excavation could cave in; several factors affect the risk of collapse, including the soil condition and type, the depth of the trench, and whether the soil was previously disturbed. All of these factors increased the likelihood of a collapse at the West Seattle project. By January 26, 2016, several other factors increased the likelihood of a collapse: the trench had been dug and left open for 10 days and the soil was saturated after several days of seasonal rain.

Washington has safety regulations that apply to jobsite excavations. For a trench as large as the one in West Seattle, these regulations require that the walls be shored to prevent a cave-in. Although Numrich placed some shoring in the trench, it was insufficient to safely stabilize the excavation.

Washington safety regulations also require that a "competent person" regularly inspect any trenches and the protective system installed in them. Clerk's Papers (CP) at 453. "Competent person" is a term defined by WAC 296-155-650(2) as someone "who can identify existing or predictable hazards in the surroundings that are unsanitary, hazardous, or dangerous to employees," and who has "authority by the nature of their position to take prompt corrective measures to eliminate [such hazards]." *See also* CP at 453. Inspections by the "competent person" must be made daily prior to the start of any

3

No. 96365-7 (consol. w/ 96566-8)

work in a trench and must be repeated after every rainstorm or other hazard-increasing occurrence. *Id*. If the "competent person" observes any evidence of a situation that could result in a possible collapse, that person must remove all employees from the trench until precautions have been taken to ensure worker safety. *Id*. at 453-55. Numrich, as the company owner and supervisor of his employees, and who was "aware of the requirements" for the protection of workers in trenches, was the "competent person" at the jobsite during the project. *Id*.

On January 26, 2016, Numrich and his employees Felton and Maximillion Henry were at the West Seattle jobsite. Shortly after 10:00 a.m., the new pipe had been pulled into place, and Felton was working in the trench beside the house. Felton began using a motorized saw to cut a pipe. This tool can cause vibrations in the ground, which can disturb the soil and increase the risk of a trench collapse.

Numrich noted and commented to Henry that Felton's use of the saw in the trench was "'vibrating the heck out of the ground.'" *Id*. at 454, 465. Despite being aware of the risks, Numrich made no effort to halt Felton's use of the saw in the trench and did not reinspect the trench after Felton finished using the equipment. *Id*. at 454-56, 465-67. Numrich left the jobsite to buy lunch for his crew. Approximately 15 minutes after Numrich left, the trench collapsed, burying and killing Felton.

Procedural history

On January 5, 2018, the State initially charged Numrich with manslaughter in the second degree (RCW 9A.32.070) (count 1) and violation of labor safety regulation with

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 96365-7 (consol. w/ 96566-8)

death resulting (RCW 49.17.190(3)) (count 2). *Id*. at 1-2. On April 30, 2018, Numrich moved to dismiss the manslaughter charge. He argued that under Washington's general-specific rule, the specific statute precluded prosecution under the general manslaughter statute. Over the next several months, the parties filed multiple rounds of briefing on the matter.

The hearing on the motion to dismiss occurred on July 19, 2018. At the time, King County Superior Court Judge John Chun took the matter under advisement and ultimately denied the defense motion. The parties appeared before Judge Chun again on August 23, 2018, and presented argument on certification for discretionary review. *Id*. at 194; Hr'g Tr. at 68-83. The court granted Numrich's motion to certify, and Numrich then filed a notice of direct discretionary review with this court. *Id*. at 248, 244. Numrich's motion for discretionary review and statement of grounds for direct review timely followed on September 28, 2018, and was assigned case number 96365-7.

On October 18, 2018, the day that the State's answer was due in this court, the State notified Numrich's counsel in an e-mail that the State intended to amend the charging information. The State attached a proposed amended information that added a charge of manslaughter in the first degree. Numrich's counsel objected and noted his intent to seek discovery related to the timing and circumstances of the State's tactics.

Later the same day, the State filed its answer in this court, which noted the State's intended amendment, contending that discretionary review would be a useless exercise:

5

No. 96365-7 (consol. w/ 96566-8)

> Even if this Court were to accept review and rule in Numrich's favor, he will still face felony manslaughter charges. . . . Here, the State intends to add a count of Manslaughter in the First Degree.

*Id*. at 634. The State added, "The State's motion to amend the Information is in the process of being scheduled and there is no basis to conclude that it will not be granted." *Id*.

On October 30, 2018, the defense filed opposition pleadings and a motion to compel discovery in the superior court. *See id*. at 250-274; 423-29. The next day, the parties presented oral argument on the motion to amend in front of King County Superior Court Judge James Rogers.

On November 1, 2018, Judge Rogers issued a ruling granting the motion to amend. *Id*. at 470. However, the court noted that this was "a highly unusual case" and sua sponte awarded attorneys' fees against the State. *Id*. at 471. The court explained that it had "never awarded terms in a criminal case and they are not a remedy except in highly unusual situations." *Id*. Judge Rogers also certified the order on motion to amend:

> The Order Granting the Amendment only is hereby certified for appeal to join the discretionary appeal currently pending in the Washington Supreme Court. Per Judge Chun's Order of 23 August 2018, this Court concludes that the Amendment adds a charge that is inextricably related to the issues of law certified by Judge Chun under RAP 2.3(b)(4).

*Id*. at 471-72. In addition, the court found that "the State is using this amendment to obtain dismissal of the discretionary review" and that "there are no additional facts or discovery or new legal theory." *Id*. at 471.

No. 96365-7 (consol. w/ 96566-8)

In the afternoon of November 1, 2018, the parties presented argument to Commissioner Michael Johnston on the pending motion for direct discretionary review. On November 5, 2018, Commissioner Johnston issued a ruling that recognized the new certification. Commissioner Johnston deferred ruling on the motion pending Numrich's filing of a second notice of discretionary review, supporting briefing, and this court's consideration regarding "whether to consolidate the motions and statements of grounds for direct review or consider them together as companions." *Id*. at 769-70. On November 16, 2018, Numrich filed his second notice of discretionary review, which was subsequently assigned case number 96566-8.

Meanwhile, on November 13, 2018, the State filed, in the trial court, a motion to reconsider the imposition of sanctions and Numrich filed a response and a motion to dismiss pursuant to CrR 8.3(b) (governmental misconduct or arbitrary action) or, alternatively, to reconsider order on motion to amend. *Id*. at 878-98, 870-77; *see also id.* at 766-869. The parties also filed pleadings regarding petitioner's fee petition.

On December 21, 2018, the trial court issued an order denying the State's motion to reconsider and denying the defense motion to dismiss or reconsider, explaining that "it was unquestionably the right of the State to amend if it chose." *Id*. at 976-77. Following additional briefing on the fee issue, on January 28, 2019, the court granted Numrich's fee request in full and ordered the State to pay $18,252.49. *Id*. at 1132.

Thereafter, the parties completed briefing on Numrich's second motion for discretionary review. On July 10, 2019, this court granted Numrich's motion for

7

No. 96365-7 (consol. w/ 96566-8)

discretionary review and consolidated case number 96566-8 with this matter. In the same order, this court also accepted review of the State's motion for direct discretionary review of the order imposing sanctions and the amount of the fees, and consolidated those issues in this matter as well. Altogether, the cases were consolidated under cause number 96365-7.

ANALYSIS

Statutory Concurrency

This case turns on whether Washington's manslaughter statute, RCW 9A.32.070, and the WISHA homicide statute, RCW 49.17.190(3), are concurrent statutes for the purpose of the general-specific rule. The general-specific rule is a "well established rule of statutory construction that '[if] a special statute punishes the same conduct [that] is punished under a general statute, the special statute applies and the accused can be charged only under that statute.'" *State v. Shriner*, 101 Wn.2d 576, 580, 681 P.2d 237 (1984) (quoting *State v. Cann*, 92 Wn.2d 193, 197, 595 P.2d 912 (1979)). "It is not relevant that the special statute may contain additional elements not contained in the general statute . . . . The determining factor is that the statutes are concurrent in the sense that the general statute will be violated in each instance where the special statute has been violated." *Id.*

"Under this rule, if 'concurrent general and special acts are in pari materia [on the same subject or matter] and cannot be harmonized, the latter will prevail, unless it appears that the legislature intended to make the general act controlling.'" *State v. Conte*,

8

No. 96365-7 (consol. w/ 96566-8)

159 Wn.2d 797, 803, 154 P.3d 194 (2007) (quoting *Wark v. Wash. Nat'l Guard*, 87 Wn.2d 864, 867, 557 P.2d 844 (1976)).  Consideration of whether two statutes are concurrent is a question of law reviewed de novo.  *Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 377 P.3d 199 (2016).

The manslaughter statute, RCW 9A.32.070, provides that "[a] person is guilty of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person."  A person is criminally negligent when they fail "to be aware of a substantial risk that a wrongful act may occur."  RCW 9A.08.010(1)(d).

The relevant WISHA provision states:

> Any employer who willfully and knowingly violates the requirements of RCW 49.17.060, any [listed] safety or health standard . . . and that violation caused death to any employee shall, upon conviction be guilty of a gross misdemeanor and be punished by a fine of not more than one hundred thousand dollars or by imprisonment for not more than six months or by both.

RCW 49.17.190(3).

Numrich argues that the State improperly charged him with second degree manslaughter under RCW 9A.32.070, and that instead, RCW 49.17.190(3)—the specific WISHA statute—controls.  Focusing on the mens rea in each statute, Numrich reasons that the specific WISHA provision requires proof of a higher mental element ("willfully and knowingly") than the general manslaughter provision ("criminal negligence"), and therefore, every time an employer willfully or knowingly fails to comply with WISHA, it can be assumed that the employer has also negligently or grossly deviated from the

9

standard of care. He urges that the WISHA statute would never be applicable if the State is allowed to charge under both the general manslaughter statute and the specific statute.

The State counters that the general-specific rule does not apply here because RCW 49.17.190(3) and RCW 9A.32.070 have different subject matters, criminalize different conduct, and are not concurrent. Further, the State argues that applying the general-specific rule in the present case would weaken the statutory purpose of RCW 49.17.190(3), which ensures safe and healthy working conditions for all employees, and would lead to absurd results. We agree.

"A more specific statute supersedes a general statute only if the two statutes pertain to the same subject matter and conflict to the extent they cannot be harmonized." *In re Estate of Kerr*, 134 Wn.2d 328, 343, 949 P.2d 810 (1998). Courts generally begin this analysis by comparing the elements of the general and specific statutes at issue.

Here, Numrich recognizes that the mens rea required to prove manslaughter is different than that required by the WISHA statute. However, he points to RCW 9A.08.010(2), which states that "[w]hen a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly." Numrich asserts that "[i]n each and every case that a person willfully and knowingly violates a safety regulation, it can also be said that the employer has engaged in negligent and reckless conduct." Br. of Pet'r at 20-21.

Numrich is correct that the mental state of "willfully and knowingly" will always satisfy "negligent and reckless" conduct. However, the critical difference in the two

10

No. 96365-7 (consol. w/ 96566-8)

statutes at issue here is the *object* of the mental state. *State v. Gamble*, 154 Wn.2d 457, 114 P.3d 646 (2005), is instructive on this point. While *Gamble* concerned a different issue (whether manslaughter is a lesser included offense of felony murder), the court's reasoning applies here. With regard to the mental element of manslaughter, the court held that "manslaughter requires the proof of a mens rea element vis-à-vis the resulting death." *Id*. at 469. In contrast, the court noted that to prove felony murder, the State is not required to prove any mental element as to the killing itself. *Id.* at 468. As applied here, the object of the mental element in manslaughter statutes is the resulting death, while the object of the mental element in the WISHA statute is the violation of a safety rule. Similar to felony murder, the WISHA statute does not require the State to prove any mental element as to the death in order to prove a violation of the WISHA statute, only that a death resulted. Thus, while the level of mental culpability may have the same legal effect in the manslaughter and WISHA statutes, the mental element in each statute is related to different conduct. Thus, the provisions are not concurrent.

Numrich relies on several cases, but they are distinguishable. In *State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982), the petitioners there were on work release and failed to return. They were charged with escape in the first degree. On appeal, they argued that RCW 72.65.070 (criminalizing failure to return to work release) was the more specific statute and that they could not be charged under the escape statute. The court agreed, holding that the general-specific rule prohibited prosecution of a work release inmate under the general escape statute. *Id.* at 257-58. In reaching its conclusion, the court

11

compared the difference in the mental state between the two provisions: the general

escape statute (lack of mental intent requirement) with the failure to return to work

release statute (willful mental state). The court noted a distinction between the two and

said such distinction could lead the State to charge escape instead of failure to return

because the State would not be required to prove any mental state under the escape

statute. *Id*. at 258-59.

Similarly, in *Shriner*, 101 Wn.2d at 579-80, the court examined the elements of

first degree theft and the offense of criminal possession of a rented motor vehicle and

found the statutes concurrent. Both statutes criminalized the act of exerting unauthorized

control over property with the intent to deprive the owner of the property, but the crime

of criminal possession of a rented motor vehicle was more specific because it included an

additional element of a demand notice. *Id.* at 580-83. As with the statutes at issue in

*Danforth,* the mental element in each statute under consideration in *Shriner* related to the

same conduct—taking property.

Finally, in *State v. Walls*, 81 Wn.2d 618, 503 P.2d 1068 (1972), this court reversed

a conviction under the felony larceny statutes (RCW 9.54.010(2) and RCW 9.54.090) for

"obtaining goods and merchandise . . . by false and fraudulent representations," because

those same acts were also prohibited by more specific misdemeanor statutes (RCW

9.45.040 and RCW 19.48.110). *Id*. at 620. The court concluded that the specific

defrauding an innkeeper statute (RCW 19.48.110) and the general larceny statutes were

concurrent and therefore the specific statute applied. In reaching its decision, the court

12

noted that the legislature had established a "complete act" dealing with the liability and protection of hotels, inns, and lodging houses, including the provision making the defrauding of a such an establishment a gross misdemeanor. *Id.* at 623. The court was persuaded that the legislature intended the defrauding of hotels, inns, and lodging houses be prosecuted as a misdemeanor.

Although superficially similar, in each of the statutes discussed in preceding cases, the object of the mental state related to the same conduct, yet the mens rea differed. In contrast, the mental state under the relevant statutes here—RCW 9A.32.070 and RCW 49.17.190(3)—focus on different conduct. The WISHA statute is aimed at punishing a willful, knowing violation of safety rules that results in death, while the mental state in the manslaughter statutes focuses on negligent or reckless disregard of a substantial risk that a death will occur.

Numrich also argues that "[i]t is impossible to envision a legally plausible case where a defendant might be guilty of the specific WISHA statute but acquitted of the more general manslaughter statutes." Br. of Pet'r at 20. But, it is not unusual in criminal law that multiple statutes can be violated by the same set of facts. Whether the State prevails will depend on whether it can prove the elements of the crime. *E.g.*, *State v. Finister*, 5 Wn. App. 44, 46, 486 P.2d 114 (1971) ("It is axiomatic that the state must prove all elements of a crime beyond a reasonable doubt, if a criminal conviction is to stand."). To prove manslaughter, the State must prove beyond a reasonable doubt that the defendant recklessly or with criminal negligence disregarded the substantial risk that

13

death would occur. *Gamble*, 154 Wn.2d at 467. To prevail on a WISHA charge, the State need show only that the defendant recklessly and willfully violated a safety rule. As in the felony murder context, where the statute requires proof that the death flows from the commission of the felony, the State must prove only that death flowed from the violation of a safety rule. If the State proves only that the defendant willfully and knowingly violated a safety rule, but not that the defendant was criminally negligent or reckless as to the substantial risk of death, the State will fail to prove manslaughter. It is conceivable that some intentional or knowing violations of the WISHA homicide statute would create a failure to observe a *minimal* risk of death, whereas the second degree manslaughter statute requires a failure to observe a *substantial* risk of death. Thus, the general second degree manslaughter statute would not always be violated every instance the specific WISHA homicide statute is.

Next, Numrich argues that "there is no evidence that the legislature intended to make the general manslaughter statutes controlling." Reply Br. of Pet'r/Cross-Resp't at 10. This court applies the general-specific rule to preclude a criminal prosecution "only where the legislative intent is crystal clear." *Conte*, 159 Wn.2d at 815. "It is the duty of the court to construe statutes in the manner that best fulfills the legislative purpose and intent." *State v. Haggard*, 195 Wn.2d 544, 547-48, 461 P.3d 1159 (2020).

Numrich maintains that WISHA is the workplace safety equivalent to the Industrial Insurance Act's (IIA), Title 51 RCW, worker compensation system; and, like the IIA, WISHA is a compromise that balances workplace safety with economic stability.

14

No. 96365-7 (consol. w/ 96566-8)

He contends that if the legislature had intended that workplace fatality accidents should be punished under the general manslaughter statute, it never would have enacted RCW 49.17.190(3).

This court accords substantial weight to an agency's interpretation within its area of expertise and upholds that interpretation if it reflects a plausible construction of the regulation and is not contrary to legislative intent. *Frank Coluccio Constr. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 36, 329 P.3d 91 (2014). However, the court retains the ultimate responsibility for interpreting a regulation. *Id.* IIA clearly states that *it* is the exclusive remedy for worker compensation claims, RCW 51.04.010; WISHA does not similarly so provide. As amicus Department of Labor & Industries (L&I) points out, "[h]ad the Legislature intended to make WISHA the exclusive remedy for workplace safety issues it would have said so, just like it did for the [IIA]." Br. of Amicus Curiae L&I at 9.

The legislative history of WISHA contains a legislative committee discussion regarding the need to avoid federal preemption of the Occupational Safety and Health Act of 1970 (OSHA). Several WISHA provisions are identical to OSHA provisions and are intended to be analogous to them. *Enacting the Washington Industrial Safety and Health Act of 1973: Hearing on SB2389 Before the S. Comm. on Labor* at 2, 43d Leg., Reg. Sess. (Wash. Feb. 2, 1973). Relevant here, OSHA and WISHA have nearly identical provisions creating criminal misdemeanor culpability for willful and knowing violations of safety rules that result in death. *Compare* RCW 49.17.190(3), *with* 29

15

No. 96365-7 (consol. w/ 96566-8)

U.S.C. § 666(e). The federal provision has been construed not to limit the states' use of their state criminal laws in addressing workplace deaths. "Nothing in [OSHA] or its legislative history suggests that Congress intended . . . to preempt enforcement of State criminal laws of general application, such as murder, manslaughter, or assault." H.R. REP. NO. 100-1051, at 9 (1988). Based on the legislative history, neither Congress nor our state legislature has expressed an intent to preclude Washington prosecutors from bringing homicide charges against employers under Washington State law after a workplace death has occurred. In reaching this conclusion, we also find persuasive numerous decisions amicus refers us to from other jurisdictions that have upheld the application of other criminal laws in prosecuting workplace deaths. *See, e.g.*, *State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 184, 228 P.3d 909 (Ct. App. 2010); *Sabine Consol., Inc. v. State*, 806 S.W.2d 553, 557 (Tex. Crim. App. 1991); *People v. Chicago Magnet Wire Corp.*, 126 Ill. 2d 356, 367-68, 534 N.E.2d 962, 128 Ill. Dec. 517 (1989); *People v. Pymm*, 76 N.Y.2d 511, 521, 563 N.E.2d 1, 561 N.Y.S.2d 687 (1990); *State ex rel. Cornellier v. Black*, 144 Wis. 2d 745, 755, 425 N.W.2d 21 (Ct. App. 1988).

Finally, the State contends, "[A]ccepting Numrich's argument that the Legislature intended for RCW 49.17.190(3) to preclude prosecution under RCW 9A.32.070 in circumstances where both applied would require this Court to violate the general rule that statutes should not be construed in [a] manner that leads to absurd results." State's Answer to Mot. for Discr. Review at 15-16; Br. of Resp't/Cross-Pet'r at 23-24; *see also State v. Larson*, 184 Wn.2d 843, 851, 365 P.3d 740 (2015). In *Five Corners Family*

16

*Farmers v. State*, 173 Wn.2d 296, 311, 268 P.3d 892 (2011), we cautioned that the absurd results canon of statutory construction should be used "sparingly" and "if a result 'is conceivable, the result is not absurd.'" (quoting *State v. Ervin*, 169 Wn.2d 815, 824, 239 P.3d 354 (2010)). However, we agree with amicus L&I and the State that if Numrich's argument is followed to its logical conclusion, RCW 49.17.190 would provide less protection to a worker than to a member of the public and would fail in its purpose of providing safe working conditions for workers in our state. *Frank Coluccio Constr. Co.*, 181 Wn. App. at 36.

Amicus offers several examples that we find persuasive: since the WISHA statute provides only a criminal sanction in the case of a death, an employer whose employee is severely injured, but not killed, may face felony assault charges but only a misdemeanor if the employee dies; if it is an employee, not the employer, who willfully and knowingly violates a safety rule that results in death, the employee may be charged under general criminal laws where an employer who similarly violated the rules could not; if the employer willfully and knowingly violates a safety rule and both an employee and a nonemployee die, the employer could face a manslaughter charge for the nonemployee but only a misdemeanor for the death of their employee. We do not believe that the legislature intended such results.

For these reasons, we agree with the State that the general-specific rule does not apply. Accordingly, the trial court did not err in so holding.

17

No. 96365-7 (consol. w/ 96566-8)

Amended Information

A trial court may permit an information to be amended at any time before verdict so long as "substantial rights of the defendant are not prejudiced." CrR 2.1(d). A defendant opposing amendment bears the burden of "showing specific prejudice to a substantial right." *State v. Thompson*, 60 Wn. App. 662, 666, 806 P.2d 1251 (1991). A court's ruling on a State's motion to amend is discretionary. *State v. Powell*, 34 Wn. App. 791, 793, 664 P.2d 1 (1983) (citing CrR 2.1(d)). A court abuses its discretion when it takes a position no reasonable person would adopt. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).

The State moved to amend the charges against Numrich, before a trial date had been set, in order to add an alternative charge that might otherwise expire. The additional charge arose from the same facts as the original charges and would not require any additional defense investigation or affect the nature of Numrich's defense at trial, which was still months away.

In his briefing opposing the motion, Numrich argued that (1) the State's motion was the product of gamesmanship and bad faith litigation tactics, (2) the State should be estopped from seeking amendment, (3) the State's motion prejudiced his substantial rights, (4) the State's motion was both actually and presumptively vindictive, and (5) the proposed count of first degree manslaughter was not supported by probable cause. CP at 250-74. The State responded to each argument and also explained why the motion to amend was being brought when it was and how it was submitted. *Id*. at 430-68. At the

18

No. 96365-7 (consol. w/ 96566-8)

hearing on the motion, the trial court questioned the State about the timing and circumstances concerning the motion to amend. Hr'g Tr. at 84-90.

After considering all of these matters, the trial court found that the "prejudice" claimed by Numrich was really more a complaint about the costs he had incurred in the appellate process up to that point and an expression of frustration that the State had not brought the motion to amend sooner. CP at 470. The trial court concluded that this was not a specific prejudice to a substantial right of the defendant within the meaning of CrR 2.1(d). *Id*. at 470-72. The trial court also found that the State had been candid in explaining why the motion to amend had been brought when and how it had and that there was no evidence that it was vindictive; the court granted the State's motion to amend. *Id*.

Numrich then filed motions in the alternative asking the trial court to either dismiss some or all of the counts or to reconsider its decision. *Id*. at 870-77. The trial court issued a written ruling indicating that it had reviewed all of the pleadings and considered the arguments therein but that none of them had changed its decision. *Id*. at 976-77.

In this court, Numrich asserts that there are numerous reasons why the State's motion to amend should have been denied. First, he argues that the trial court applied the wrong legal standard when it stated that "it was unquestionably the right of the State to amend if it chose." *Id*. at 977. Numrich contends that the use of this phrase shows that the trial court believed that the State had the right to amend whenever it wanted. Br. of

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 96365-7 (consol. w/ 96566-8)

Pet'r at 30-31. But this argument takes the trial court's comment out of context. The trial court was aware that the State's right to amend was not absolute because Numrich had repeatedly pointed out that the court had wide discretion to deny the State's motion even if it found no prejudice to him. CP at 259, 874. Accordingly, it is apparent that the trial court's ruling was that the State was allowed to amend the charges *in this case*, not that the State always has an unfettered right to amend at any time.

Second, Numrich asserts that there was "absolutely no justification for the State's delayed amendment" and implies that the State brought the motion as a tactical maneuver in order to convince this court to deny his motion for discretionary review, and, thus, that the trial court abused its discretion in granting the State's motion to amend. Br. of Pet'r at 31.

As noted above, the State explained how and why the motion to amend came about. CP at 449-50. In granting the motion to amend, the trial court accepted the State's explanation, finding that the State had been candid with the court and that there was no evidence that the State's actions were vindictive or otherwise improper. *Id*. at 470-71. The court, after hearing all of the arguments and reviewing all of the facts, rejected Numrich's accusations and did not disturb its finding regarding the credibility of the State's explanation of events. *Id*. at 976-77. Despite Numrich's claim to the contrary, the trial court did not find that the State's purpose in seeking the amendment was to use it as a tool to dismiss discretionary review.

20

No. 96365-7 (consol. w/ 96566-8)

Third, Numrich argues that the trial court abused its discretion by failing to consider his claim that the State's motion to amend constituted prosecutorial vindictiveness. Br. of Pet'r at 37-41. But Numrich's claims of prosecutorial vindictiveness were specifically argued to, and rejected by, the trial court. CP at 263-66, 471.

"Prosecutorial vindictiveness is [the] intentional filing of a more serious crime in retaliation for a defendant's lawful exercise of a procedural right." *State v. McKenzie*, 31 Wn. App. 450, 452, 642 P.2d 760 (1981). However, it is also well recognized that "[a]n initial charging decision does not freeze prosecutorial discretion" and that prosecutorial vindictiveness must be distinguished from the "rough and tumble" of legitimate plea bargaining and other aspects of pretrial practice. *State v. Lee*, 69 Wn. App. 31, 37, 35, 847 P.2d 25 (1993). A defendant asserting prosecutorial vindictiveness in the pretrial context bears the burden of establishing either actual vindictiveness or "'a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness.'" *State v. Bonisisio*, 92 Wn. App. 783, 791, 964 P.2d 1222 (1998) (internal quotation marks omitted) (quoting *United States v. Wall*, 37 F.3d 1443, 1447 (10th Cir. 1994)). If the defendant makes this preliminary showing, the State must justify its decision with "'legitimate, articulable, objective reasons' for its actions." *Id.* (internal quotation marks omitted) (quoting *Wall*, 37 F.3d at 1447).

Numrich establishes neither actual vindictiveness nor a "realistic likelihood of vindictiveness" that would give rise to a presumption of vindictiveness. Further, the

21

No. 96365-7 (consol. w/ 96566-8)

State gave a detailed explanation of how and why the motion to amend came about when it did, *see* CP at 449-50, 475-83, constituting the sort of "legitimate, articulable, and objective reasons" for the State's actions that were sufficient to rebut a presumption of vindictiveness. Accordingly, the trial court did not abuse its discretion in rejecting Numrich's claim of vindictive prosecution.

Fourth, Numrich argues that the trial court abused its discretion by failing to consider his claim that the State's motion to amend violated principles of estoppel. Br. of Pet'r at 42-43. But again, Numrich's estoppel argument was explicitly argued to the trial court and the trial court rejected it when it granted the motion to amend. CP at 261-62, 470-72. While Numrich disagrees with the trial court's ruling, he has not established that the court failed to consider it.

Numrich's estoppel argument is baseless in any event. Estoppel applies only when a party takes one position in a court proceeding and later seeks an advantage by taking "'a *clearly inconsistent* position.'" *Arkison v Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007) (emphasis added) (internal quotation marks omitted) (quoting *Bartley-Williams v. Kendall*, 134 Wn. App. 95, 98, 138 P.3d 1103 (2006)). Here, in response to a motion to dismiss a count of second degree manslaughter, the State argued that prosecution of that charge was not precluded by the "general-specific rule." The State's later motion to amend to add an alternative charge of first degree manslaughter is not inconsistent with that position.

22

No. 96365-7 (consol. w/ 96566-8)

Finally, Numrich argues that the trial court abused its discretion when it concluded that it had no power to deny the motion to amend even though there was no probable cause for the count of first degree manslaughter. Br. of Pet'r at 43-44. That was not what the trial court did. Moreover, even if probable cause was a necessary prerequisite to amendment, there is ample probable cause supporting the charge of first degree manslaughter. A person commits first degree manslaughter when he or she "recklessly causes the death of another person." RCW 9A.32.060(1)(a). In this context, a person acts recklessly when "he or she knows of and disregards a substantial risk that [death] may occur and [this] disregard of such substantial risk is a gross deviation from the conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.03 & cmt. at 225-26 (citing *Gamble*, 154 Wn.2d at 467-68).

The substantive facts of Numrich's crime as set forth above and the reasonable inferences that can be drawn from them establish probable cause for the charge of first degree manslaughter. As the owner and operator of the company and the "competent person" for the project, Numrich was well aware of the general risk of death posed to workers in trenches like the one in question. CP at 453-56, 466-67. He was further aware that the risk was substantially elevated given all of the risk factors that were present at this particular jobsite on this particular day. *Id*. at 456, 462-67. However, despite being aware of all these risks and being the person responsible for guarding against them, Numrich left the site without making an effort to address these hazards and

23

No. 96365-7 (consol. w/ 96566-8)

without reinspecting the trench after they had arisen. *Id*. at 456, 464-67. The trench then

collapsed and killed one of Numrich's employees. *Id*. at 455, 465. These facts establish

probable cause to conclude that Numrich knew of and disregarded a substantial risk that

death might occur, that his disregard of this risk was a gross deviation from the conduct a

reasonable person would exercise in the situation, and that Felton died as a result.

We hold that the trial court did not abuse its discretion in granting the State's

motion to amend the information to add an alternative charge of first degree

manslaughter.

Sanctions against the State

As noted, the trial court granted the State's motion to amend, but simultaneously

and sua sponte awarded terms against the State based on the timing of the motion to

amend. The trial court's order explained:

> The real prejudice claimed by the defense are the costs incurred in
> proceeding with the appellate process and a real frustration that the
> Prosecutor, who was candid with the Court in admitting that he did not
> consider the amendment until very late in the pending appellate process,
> filed this amendment so late. Discretionary appeals are not unusual in this
> Court's experience. What is unusual is to not inform all parties of relevant
> considerations in light of the appeal. Mere notice of the amendment at the
> beginning of the appellate process would have remedied the situation. . . .
>     . . . .
> This is a highly unusual case. What is singular here is that the State
> did not give notice of an amendment in an obvious situation that would
> have saved countless hours and fees for an appeal, and where the State is
> using this amendment to obtain dismissal of the discretionary review, and
> so announcing in the responsive appellate briefing, and where the issues
> presented by the Amendment are obviously intertwined with the issues on
> discretionary appeal, and where there are no additional facts or discovery or
> new legal theory. In this singular instance, it is this Court's decision to
> award terms measured in the attorneys' fees for the defense for work on the

24

No. 96365-7 (consol. w/ 96566-8)

> discretionary appeal to this point. No fees are awarded for any work done in Superior Court. The defense shall file a fee petition within 14 days of this Order. The State may respond within seven days.

CP at 470-71.

As noted, the State sought reconsideration of this sanction and in response Numrich filed a response and a motion to dismiss pursuant to CrR 8.3(b) or, alternatively, to reconsider order on motion to amend. *Id*. at 878-98, 870-77; *see also id*. at 766-869. The trial court subsequently issued an order denying the State's motion to reconsider and denying the defense motion to dismiss or reconsider. *Id*. at 976-77. The State sought review of the sanction order, which we granted.

An award of attorneys' fees is reviewed for abuse of discretion. *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 665, 989 P.2d 1111 (1999). A trial court does not abuse its discretion unless the exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons. *Id.*

Sanctions, including attorney fees, may be imposed under the court's inherent equitable powers to manage its own proceedings. *State v. Gassman*, 175 Wn.2d 208, 210-13, 283 P.3d 1113 (2012). To impose attorney fee sanctions under the court's equitable powers, it is sufficient and best practice for a court to make a finding of bad faith. *Id.* at 211. But a finding of bad faith is not required. *Id.* An appellate court may still uphold a sanction "where an examination of the record establishes that the court found some conduct equivalent to bad faith." *Id.* The issue in *Gassman* was that the

25

No. 96365-7 (consol. w/ 96566-8)

State amended the information to add the first degree manslaughter charge after the defense sought discretionary review and submitted its briefing.

The State argues this case is analogous to *Gassman*. In *Gassman*, the State moved to amend the information on the first day of trial, seeking to change the date the alleged crime occurred. *Id.* at 210. The defense objected, arguing that they prepared alibi defenses based on the original charged date. The court allowed the amendment, continued the trial, and imposed sanctions in the form of attorney fees. The *Gassman* court determined that this court could not infer any conduct tantamount to bad faith, in part, because the court found that the State's behavior was "careless" but not purposeful. Further, defense counsel failed to file notice of an alibi defense, was alerted of the possible date change several days ahead, conceded that the original "on or about" language in the information was sufficient to include the new date, and did not need or request a continuance given the amendment. *Id.* at 212-13.

The State attempts to characterize its late amendment here as a "careless" error similar to *Gassman*. However, unlike *Gassman*, the *Numrich* court has made a finding that the State acted intentionally to moot the discretionary appeal and the record supports this finding. In its ruling on the motion to amend, the trial court found:

> What is singular here is that the State did not give notice of an amendment in an obvious situation that would have saved countless hours and fees for an appeal, and *where the State is using this amendment to obtain dismissal of the discretionary review*, and so announcing in the responsive appellate briefing, and where the issues presented by the Amendment are obviously intertwined with the issues on discretionary appeal, and where there are no additional facts or discovery or new legal theory.

26

No. 96365-7 (consol. w/ 96566-8)

CP at 471 (emphasis added). This is an express finding that the State used the late amendment to obtain dismissal of discretionary review and that there was a more appropriate course available to amend prior to the discretionary appeal.

The State claims that this is not a basis to impose sanctions and argues that it became aware of the need to add the first degree manslaughter charge after reviewing the defendant's general-specific rule arguments in his petition for discretionary review. However, the record reveals that the State was aware of the defendant's arguments and that both parties disputed the effects of first and second degree manslaughter under the general-specific rule throughout the initial motion to dismiss and briefing on the motion to amend. The trial court's finding that the State sought the amendment to moot the discretionary appeal paired with the State's withholding of the amendment until midway through the discretionary appeal process, despite having notice beforehand, suggests conduct tantamount to bad faith. The trial court did not abuse its discretion in imposing attorney fees for the defendant's preparation of the discretionary appeal.

Further, the superior court ordered the State to pay Numrich $18,252.49 for work on the first motion for direct discretionary review, which recognized 38.1 hours of attorney time, equivalent to approximately one workweek of total time. This fee award reflects the briefing produced (20 page motion for discretionary review, 15 page statement of grounds for direct review, 10 page reply), the hundreds of pages of appendices to the briefing, the State's briefing that required analysis and legal research (20 page answer to motion for discretionary review and 10 page answer regarding direct

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

review), preparation for and completion of oral argument to the commissioner, the

complexity of the litigation; and the importance of the consequences to the client

(Numrich has no prior criminal history and faces first degree manslaughter and 6.5 to 8.5

years in prison).

> [T]he determination of a fee award should not be an unduly burdensome proceeding for the court or the parties. As long as the award is made after considering the relevant facts and the reasons given for the award are sufficient for review, a detailed analysis of each expense claimed is not required.

*Steele v. Lundgren*, 96 Wn. App. 773, 786, 982 P.2d 619 (1999) (footnote omitted).

Here, counsel submitted detailed time sheets, along with a supporting declaration, that

documented the compensable time. CP at 978-91. After reviewing the filings, the court

found the time (13.6 hours by attorney Todd Maybrown and 24.5 hours by attorney

Cooper Offenbecher) "was a reasonable amount of time given the novelty of the issues

presented, the complexity of the litigation, the forum, and the importance of the

consequences to Mr. Numrich. The work was not duplicative or unproductive." CP at

1131. The trial court's findings were based on a detailed record that provided a

meaningful opportunity for review.

The State argues that there is "no indication that the trial court actively and

independently considered the reasonableness of Numrich's fee petition or the State's

objections to the hourly rates or number of hours billed." Br. of Resp't/Cross-Pet'r at 56.

But on December 21, 2018, the trial court recognized the State's objections and requested

additional information: "Mr. Hinds is correct that Mr. Offenbecker's [sic] original fee

28

No. 96365-7 (consol. w/ 96566-8)

petition was inadequate." CP at 977. The trial court requested that counsel refile a petition "listing the number of hours for each lawyer and the subject matter they worked [on]. This may be done redacted if there is attorney-client work product or privileged areas." *Id.* In response, Numrich's counsel provided billing time sheets as directed. *Id.* at 982-91.

The State relies on *Berryman v. Metcalf*, 177 Wn. App. 644, 658, 312 P.3d 745 (2013), in which the Court of Appeals faulted a fee award where there was "no indication that the trial judge actively and independently confronted the question of what was a reasonable fee. We do not know if the trial court considered any of Farmers' objections to the hourly rate, the number of hours billed, or the multiplier." *See* Br. of Resp't/Cross-Pet'r at 55. But here, the trial court explicitly stated that the time claimed by defense counsel "was a reasonable amount of time given the novelty of the issues presented, the complexity of the litigation, the forum, and the importance of the consequences to Mr. Numrich. The work was not duplicative or unproductive." CP at 1131. The court added, "The Court reviewed all . . . extensive pleadings, the time billings in the case, and declines to re-review any of its earlier decisions." *Id.* at 1132. The trial court clearly engaged with the fee petition, and both parties clearly put a significant amount of time into this case. Accordingly, 38.1 hours is a reasonable amount of time to spend on this litigation project.

Further, a trial court has the inherent knowledge and experience to evaluate the reasonableness of an hourly rate. *See Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir.

29

No. 96365-7 (consol. w/ 96566-8)

2011) (adopting holdings of other circuits holding that "judges are justified in relying on their own knowledge of customary rates and their experience concerning reasonable and proper fees" (citing *Norman v. Hous. Auth.*, 836 F.2d 1292, 1303 (11th Cir. 1988) (courts are themselves "experts" as to the reasonableness of attorney fees and award may be based on court's own experience))).

Washington courts have routinely afforded deference to the trial court's own experience evaluating the reasonableness of attorney fees:

> Generally the testimony of expert witnesses [on the issue of the value of the services of an attorney] is not essential. The court, either trial or appellate, is itself an expert on the question of the value of legal services, and may consider its own knowledge and experience concerning reasonable and proper fees, and may form an independent judgment either with or without the aid of testimony of witnesses as to value.

*Brown v. State Farm Fire & Cas. Co.*, 66 Wn. App. 273, 283, 831 P.2d 1122 (1992) (alteration in original) (quoting STUART M. SPEISER, ATTORNEYS' FEES 478 (1973)) (trial court's conclusion that fees were reasonable, based on "(1) its own familiarity with [plaintiffs'] attorneys, (2) their general reputation for competence in the legal community, and (3) its finding that the fees were within the range charged by other lawyers").

Here, the trial court found that "[t]he billing rates of Mr. Numrich's attorneys—$600 for Mr. Maybrown and $400 for Mr. Offenbecher—are reasonable rates for litigation attorneys practicing in downtown Seattle with commensurate experience, and in light of the novelty and difficulty of the questions involved and the seriousness of the charges in this case." CP at 1132. The trial judge was well within his authority to verify

30

No. 96365-7 (consol. w/ 96566-8)

the reasonableness of these Seattle hourly rates. *See Brown*, 66 Wn. App. at 283. The trial court did not err in awarding sanctions against the State.

Attorney fees on appeal

In his reply brief, Numrich requests fees on appeal stating, "Pursuant to RAP 18.1, Mr. Numrich requests fees for time spent defending the fee award on appeal." Reply Br. of Pet'r/Cross-Resp't at 50. He identifies no applicable basis for such fees.[1] "Washington State courts follow the 'American Rule'—even as to a prevailing party, 'attorney fees are not available as *costs or damages* absent a contract, statute, or recognized ground in equity.'" *LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d 117, 123, 330 P.3d 190 (2014) (quoting *City of Seattle v. McCready*, 131 Wn.2d 266, 275, 931 P.2d 156 (1997)).

Also, RAP 18.1 requires that a party seeking attorney fees or expenses on review to "request the fees or expenses as provided in this rule." RAP 18.1(a). The rule further requires, "The party [requesting appellate fees] must devote a section of its *opening* brief to the request for the fees or expenses." RAP 18.1(b) (emphasis added). As noted, Numrich's request appears in his reply. He provides no basis for a fee award on appeal, and it is accordingly denied.

---

[1] Numrich cites a case concerning fee shifting statutes. Reply Br. of Pet'r/Cross-Resp't at 49-50. But no fee shifting statutes are at issue here.

No. 96365-7 (consol. w/ 96566-8)

Motions passed to the merits

Numrich filed two motions: a motion to strike amicus brief of L&I and a related motion to supplement the record regarding his objection to the amicus brief. As both motions were filed near the oral argument date set for this case, the motions were passed to the merits.

Numrich's motion to strike primarily contends that L&I worked as an "agent of the prosecutor," who is prosecuting this case "on behalf of the State of Washington"; therefore, L&I is a party to this case and "is not a proper amicus" participant. Pet'r's Answer to Amicus Curiae Br. of L&I at 1 n.1. Numrich further contends, "This case was not investigated by the Seattle Police Department, the King County Sheriff's Office, or any other law enforcement agency. L&I was *the* law enforcement agency in this case." Pet'r's Reply to Answer to Mot. To Strike Amicus Curiae L&I Br. at 4; *see also* CP at 1-9 (information levying criminal charges against Numrich and statement of probable cause from L&I investigating officer setting out the investigative history). Numrich relies on the fact that an L&I investigator provided a certification of determination of probable cause, but this does not make L&I the prosecutor's agent or bar it as an amicus. L&I is a separate state agency charged with promulgating safety regulations and investigating and enforcing compliance with those regulations. It is not an arm of the prosecutor. Nor is L&I the sole source of information for the State's charges. The record also contains a joint investigation report utilizing resources from the attorney general's office and the

32

No. 96365-7 (consol. w/ 96566-8)

prosecutor's office, describing investigation methodologies and lists of interviewees and potential witnesses concerning the workplace fatality at issue. CP at 458-68.

Numrich does not convince us that L&I is "a party" as he contends, and the agency's amicus brief is useful to the court. Numrich's motion to strike L&I's amicus brief and his related motion to supplement the record are denied.

CONCLUSION

We hold that the trial court did not err in denying the employer's motion to dismiss the second degree manslaughter charge. We hold that the trial court did not err in granting the State's motion to amend the information to add an alternative first degree manslaughter charge. We hold that the trial court did not err in awarding sanctions against the State. Further, we deny Numrich's request for fees on appeal. And finally, we deny Numrich's motion to strike amicus brief of L&I and Numrich's related motion to supplement the record, which were passed to the merits. With these holdings, we remand to the trial court for further proceedings.

33

No. 96365-7 (consol. w/ 96566-8)

_____
Madsen, J.

WE CONCUR:

_____          _____
Johnson, J.

_____          _____
Owens, J.                                   Montoya-Lewis, J.

_____          _____
Stephens, J.                                Whitener, J.

No. 96365-7

GONZÁLEZ, C.J. (concurring in part and dissenting in part) – I agree with the majority that the trial court properly denied Numrich's motion to dismiss the second degree manslaughter charge. I also agree with the majority that the trial court did not abuse its discretion in granting the State's motion to amend to add an alternative charge of first degree manslaughter. I disagree, however, that sanctions against the State are warranted. A trial court may only impose sanctions after making an express finding of bad faith or where conduct "'tantamount to bad faith'" can be inferred from the record. *State v. Gassman*, 175 Wn.2d 208, 211, 283 P.3d 1113 (2012) (internal quotation marks omitted) (quoting *State v. S.H.*, 102 Wn. App. 468, 474, 8 P.3d 1058 (2000)). The State's conduct here does not meet that standard. Therefore, the trial court abused its discretion in imposing sanctions. I respectfully dissent in part.

I recognize that whether to impose sanctions lies within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 582, 220 P.3d 191 (2009) (quoting *Mayer v.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006)). Abuse of discretion is met where the exercise of discretion is manifestly unreasonable or based on untenable grounds or reasons. *Id.* at 582-83 (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)); *see also Gassman*, 175 Wn.2d at 210. A reviewing court will uphold sanctions if the record demonstrates "conduct that was at least 'tantamount to bad faith.'" *Gassman*, 175 Wn.2d at 211 (internal quotation marks omitted) (quoting *State v. S.H.*, 102 Wn. App. at 474). "Bad faith" conduct is "willfully abusive, vexatious, or intransigent tactics designed to stall or harass." *Id.* Mere carelessness is not enough; the action must be purposeful. *Id.* at 213.

Nothing in the trial court's detailed order amounts to a finding of bad faith, and to the extent the majority suggests that a finding of intentional action amounts to bad faith, I respectfully disagree. Instead, the order establishes the trial court's understandable vexation at the State for failing to give notice of the intent to amend the charges at the beginning of the interlocutory appeal process. Nor do I find bad faith in this record. The trial court confirmed there was no evidence that the amendment was vindictive. CP at 471. The lack of courtesy shown by the State's late amendment does not meet the willfully abusive standard required to impose sanctions.

I would reverse sanctions. Accordingly, I respectfully dissent in part.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Numrich*, No. 96365-7 (González, C.J., concurring in part and dissenting in part)

González, C.J.

Yu, J.

3

*State v. Numrich (Phillip Scott)*, No. 96365-7

No. 96365-7

GORDON McCLOUD, J. (dissenting)—This court adopted the general-specific rule many years ago as a tool of statutory interpretation. The rule provides that "'where a special statute punishes the same conduct which is [also] punished under a general statute, the special statute applies and the accused can be charged only under that statute.'" *State v. Shriner*, 101 Wn.2d 576, 580, 681 P.2d 237 (1984) (quoting *State v. Cann*, 92 Wn.2d 193, 197, 595 P.2d 912 (1979)).

This judicially created general-specific rule protects the roles of all three branches of state government: it provides the *courts* with a tool to "preserve the *legislature's intent* to penalize specific conduct in a particular, less onerous way and hence to minimize sentence disparities resulting from *unfettered prosecutorial discretion.*" *State v. Albarran*, 187 Wn.2d 15, 20, 383 P.3d 1037 (2016) (emphasis added) (footnote omitted) (citing *Shriner*, 101 Wn.2d at 581-83); *see also State v. Danforth*, 97 Wn.2d 255, 259, 643 P.2d 882 (1982) (general-specific rule prevents the "impermissible potential usurpation of the legislative function by prosecutors" by taking away their authority to charge harsher, more general statutes when the legislature has prescribed more lenient, more specific punishments).

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

For that reason, we have traditionally used the general-specific rule in a commonsense and contextual manner rather than in a hypertechnical manner. Specifically, we use "[t]he general-specific rule [as] a means of answering the question: Did the legislature intend to give the prosecutor discretion to charge a more serious crime *when the conduct at issue is fully described by a statute defining a less serious crime*?" *Albarran*, 187 Wn.2d at 26 (emphasis added). We compare the subject matter of the general statute with the subject matter of the specific statute and use that comparison, as well as any relevant historical context and legislative history, to decide whether the specific statute was designed to occupy the field of the conduct that it describes, thereby foreclosing prosecution for more general crimes.

We have not typically focused on the intricacies of matters like the object on which the mens rea of the two statutes might bear. Yet that is what the majority does in this case. Majority at 10-11 (focusing on just this point and relying on *State v. Gamble*, 154 Wn.2d 457, 468-69, 114 P.3d 646 (2005)—which was not a general-specific rule case—as outcome determinative).

I disagree with this approach. The majority's hypertechnical test is not the test that our seminal general-specific decisions adopt.[1] And it does not preserve

---

[1] Indeed, it is not the approach that we adopt in other areas, either. *E.g., Ashe v. Swenson*, 397 U.S. 436, 444, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970) (when applying the

2

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

the values that our seminal general-specific decisions were designed to protect.

Our case law compels us to apply the general-specific rule in a commonsense and

contextual manner, with a view toward advancing the separation-of-powers goals

that it was designed to protect. When that latter approach is applied, it compels the

conclusion that the specific WISHA[2]-homicide statute prevails over the general

manslaughter statute in the factual scenarios that it describes.

I therefore respectfully dissent.

I. THE MAJORITY'S TEST IS NOT THE TEST THAT OUR SEMINAL
GENERAL-SPECIFIC DECISIONS ADOPTED

The majority's test is not the test that our seminal general-specific decisions

applied. The majority homes in on the objects of mens rea in each statute to isolate

a theoretical situation that could constitute WISHA-homicide but not

manslaughter. But our foundational cases in this area look to the overall scope of

the two statutes and historical context to determine whether a specific statute

occupies the field of prosecution.

---

prerequisites to collateral estoppel in a criminal case, the Supreme Court has held that they are "not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality"); *State v. Tili*, 148 Wn.2d 350, 361, 60 P.3d 1192 (2003) (adopting *Ashe*'s "realism and rationality" approach in Washington).

[2] Washington Industrial Safety and Health Act of 1973, ch. 49.17 RCW.

3

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

In 1960, for example, we recognized that prosecutors must charge specific, more lenient forms of homicide when they are available. *State v. Collins*, 55 Wn.2d 469, 348 P.2d 214 (1960). In *Collins*, the defendant had killed a pedestrian "by means of a motor vehicle," and the State charged "general manslaughter," notwithstanding the available "negligent homicide by means of a motor vehicle" statute. *Id.* at 469 (citing former RCW 46.56.040 (1937); former RCW 9.48.060 (1909)). Rather than break down mens rea elements into component parts, we analyzed the statutory and historical context.

We found that the mens rea elements of the two statutes differed— manslaughter required proof of "ordinary negligence," while negligent homicide required more than that—it required recklessness. *Id.* at 470 (citing *State v. Hedges*, 8 Wn.2d 652, 113 P.2d 530 (1941); *State v. Partridge*, 47 Wn.2d 640, 289 P.2d 702 (1955)). We ruled that even if the State could not prove the heightened recklessness mens rea of negligent homicide, it must still proceed under that specific homicide statute if the subject matter was homicide with a motor vehicle.[3]

---

[3] We made this concept even clearer in *Shriner*. In *Shriner*, the specific "failure to return a rental car" statute contained an element that was missing from the general theft statute: the element that the rental agency must have sent a written demand letter to the defendant to return the car. 101 Wn.2d at 582-83. The record in *Shriner* did not reveal whether such a demand letter had ever been sent. Nevertheless, we required the State to charge under the specific rental car statute—even if it couldn't prove all the elements of the crime. *Id.* We came to this conclusion because the "creation of a specific statute shows a legislative intent that persons who perform the *type of acts to which it is directed*

4

*Id.* Effectively, the more recent, more specific statute occupied the field of prosecution for that particular type of killing.

This court in *Collins* relied largely on the historical context of the specific statute's passage to come to this conclusion. We explained that the legislature had recognized that no prosecutor had ever obtained a conviction of manslaughter for a homicide caused by recklessness or drunk driving—and that manslaughter statute was enacted in 1854. *Id.* We concluded that the legislature had responded to that 110-year dearth of convictions by providing prosecutors with a more useful enforcement tool—one that didn't call reckless driving "manslaughter," one that prosecutors would be willing to charge, and one that jurors would be willing to accept:

> The manslaughter statute was first passed in 1854, which was prior to the aggravated problem of motor vehicle traffic that characterizes our times. The prosecuting attorneys throughout the state found a growing jury reluctance to convict automobile drivers under the manslaughter statute due to the connotations of the word 'manslaughter.' A group of them went before the 1937 legislature and successfully urged the passage of a special statute under which they could charge homicide by means of a motor vehicle.

*Id.* Based on this context, we held "that in all cases where the negligent homicide statute is applicable, it supersedes the manslaughter statute." *Id.*

---

. . . should be *punished under the specific statute or not at all.*" *Id.* at 583 (emphasis added).

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

We have the exact same historical context here. Until this case, no prosecutor in Washington had ever filed criminal manslaughter charges against an employer for an on-the-job death, despite the fact that a manslaughter statute had been on the books for over 100 years. Clerk's Papers at 18-19. The legislature responded by enacting the WISHA-homicide statute as part of the full WISHA law in 1973. LAWS OF 1973, ch. 80. The WISHA-homicide statute was thus a part of WISHA since the beginning and remains there largely unchanged to this day (with the exception of higher penalties). *Id.* § 19(3); RCW 49.17.190(3).

The majority acknowledges this history but concludes that the legislature has not affirmatively "expressed an intent to preclude Washington prosecutors from bringing homicide charges against employers under Washington State law after a workplace death has occurred."[4] Majority at 16. But we have never required specific legislative direction to invoke the general-specific rule.[5] To do so would

---

[4] The majority notes that our state legislature modeled WISHA on the federal Occupational Safety and Health Act of 1970, 29 U.S.C. ch. 15, which avoided preemption of state criminal laws. Majority at 15-16. But Congress' intent is irrelevant to application of our state's general-specific rule. The general-specific rule is designed to effectuate a *single* legislature's intent when it passes multiple criminal statutes that proscribe the same conduct. *See Albarran*, 187 Wn.2d at 20. *Federal* Congressional intent not to preclude *state* criminal enforcement by separate sovereigns has nothing to do with this analysis.

[5] Though we implied this might be required in *State v. Conte*, which relied on numerous other factors to conclude that the rule did not apply—most notably, the fact that one statute there was criminal while the other was civil. 159 Wn.2d 797, 808, 154

6

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

invert our usual analysis and would create a presumption against use of the general-specific rule. Instead, we have used the rule itself as a tool to determine legislative intent. *See, e.g.*, *Shriner*, 101 Wn.2d at 583; *State v. Walls*, 81 Wn.2d 618, 623, 503 P.2d 1068 (1972).

Like the 1937 legislature that enacted the driving-specific negligent homicide statute in *Collins*, the 1973 legislature was trying to give prosecutors, who had been unwilling to charge manslaughter or murder for a particular type of death, a misdemeanor tool to incentivize charging. Like the court in *Collins*, we should require prosecutors to use that new specific statute, drafted to control that specific situation.

We took a similar contextual approach in *Walls*, which the majority also discusses. Majority at 12. As the majority notes, *Walls* held that where the defendant was accused of using a credit card without permission to "pay" for a meal at a restaurant associated with a hotel, the State could not use the general felony larceny statutes, even though they fit that crime. Instead, the State was limited to charging under the specific "defrauding an innkeeper statute," which

---

P.3d 194 (2007). Additionally, the specific statute at issue in *Conte* expressly allowed for "'any other remedies provided by law.'" *Id.* (quoting RCW 42.17.390); *see also In re Pers. Restraint of Taylor*, 105 Wn.2d 67, 70, 711 P.2d 345 (1985) (similarly declining to apply the general-specific rule where the statutory "language clearly indicate[d] that the Legislature did not intend . . . to preempt prosecution under" the general statute).

7

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

was part of a "'complete act' dealing with the liability and protection of hotels, inns, and lodging houses, including the provision making the defrauding of such an establishment a gross misdemeanor." Majority at 12 (citing *Walls*, 81 Wn.2d at 623).

The majority neglects to mention that if we read the general and specific statutes in *Walls* very closely, we will find that it is possible to violate the specific statute, RCW 19.48.110,[6] with no mens rea at all; the general larceny statute, however, required a mens rea of willfulness or intent. 81 Wn.2d at 620-21.[7] Thus, it was possible to violate the specific statute without violating the general statute.

---

[6] As quoted in *Walls*, one of the specific statutes concerning defrauding an innkeeper, RCW 19.48.110, provided:

"Any person who shall wilfully obtain food, money, credit, lodging or accommodation at any hotel, inn, boarding house or lodging house, without paying therefor, with intent to defraud the proprietor, owner, operator or keeper thereof; or who obtains food, money, credit, lodging or accommodation at such hotel, inn, boarding house or lodging house, by the use of any false pretense; *or who, after obtaining food, money, credit, lodging, or accommodation at such hotel, inn, boarding house, or lodging house, removes or causes to be removed from such hotel, inn, boarding house or lodging house, his or her baggage, without the permission or consent of the proprietor, manager or authorized employee thereof, before paying for such food, money, credit, lodging or accommodation*, shall be guilty of a gross misdemeanor."

81 Wn.2d at 621-22 (emphasis added) (quoting Laws of 1915, ch. 190).

[7] The *Walls* court quotes the relevant general larceny statute as follows; I have placed the emphasis on the mens rea:

Every person who, *with intent to deprive or defraud* the owner thereof—

8

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

Nevertheless, we held that the specific and general statutes were concurrent,

and that the State could therefore charge only under the specific ones.[8]  *Id.* at 623.

We did that because we looked at the statutes' language in a commonsense manner

and the specific statute's enactment in historical context; we then concluded that

that history and context showed that the legislature intended the specific statute to

be the exclusive criminal enforcement tool for the conduct it described.  In other

---

. . . .

(2) Shall obtain from the owner or another the possession of or title to any
property, real or personal, by color or aid of any order for the payment or delivery
of property or money or any check or draft, knowing that the maker or drawer of
such order, check or draft was not authorized or entitled to make or draw the same,
or by color or aid of any fraudulent or false representation, personation or pretense
or by any false token or writing or by any trick, device, bunco game or fortune-
telling; or

. . . .

Steals such property and shall be guilty of larceny.

81 Wn.2d at 620 (emphasis added) (quoting RCW 9.54.010).

[8] Since *Walls*, the Court of Appeals has taken a similar approach to the general-
specific rule.  In *State v. Thomas*, the court required the State to pursue specific custodial
interference charges rather than general unlawful imprisonment charges—despite the
same type of differing "objects of mens rea" at issue in this case.  35 Wn. App. 598, 604,
668 P.2d 1294 (1983) (unlawful imprisonment required that the defendant "'knowingly
restrain[] another person'" whereas custodial interference required that the defendant
"'know[] that he has no legal right'" to interfere with custody (quoting RCW
9A.40.010(1); 9A.40.050(1))).

9

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

words, we came to the opposite conclusion from the majority in a factually comparable situation.

Why did we do that? First, we stated the general-specific rule as "where a general statute and a subsequent special law relate to the *same subject*, the provisions of the special statute must prevail." *Id*. at 622 (emphasis added). Then we determined that the laws covered the *same subject*, without delving into distinctions about objects of mens reas that might be important in hypothetical situations. If we had delved into such distinctions, we would have found that they existed.

Instead, we focused on context. The *Walls* court treated legislative history and the purpose of the full act of which the specific statute formed a part as critical. We ruled that "the legislature had established a 'complete act' dealing with the liability and protection of hotels, inns, and lodging houses, including the provision making the defrauding of such an establishment a gross misdemeanor." Majority at 12 (quoting *Walls*, 81 Wn.2d at 623). We came to that conclusion despite the fact that a close and detailed reading of the general and specific statutes would have shown that (as described above) one could violate the specific without violating the general.[9]

---

[9] I acknowledge that we have occasionally taken a far more technical approach, similar to the one that the majority takes in this case. In *Conte*, the State charged a group

10

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

Like the "complete" innkeeper statutes in *Walls,* we have a complete set of industrial safety and health laws in WISHA. In addition to providing criminal penalties for safety violations resulting in death, WISHA provides numerous regulations and restrictions, *see* RCW 49.17.040 (providing authority to promulgate safety and health standards, and many exclusive provisions for their enforcement), .120 (citations), .170 (injunctive remedies), .180 (civil penalties). When a defendant's conduct falls under this complete legislatively enacted statute, prosecutors must use that specific statute's provisions.

The statutory context also shows that the legislature intended specific penalties for a specific crime. The legislature attached unique misdemeanor penalties to criminal violations of WISHA: brief imprisonment and enormous (higher than most felony) monetary penalties. RCW 49.17.190(3) (allowing six months' incarceration and $100,000 in penalties for a first offense). The

---

of defendants with violating the general criminal statute prohibiting filing of false or forged instruments, the defense argued that the State was limited to charging under the more lenient concealment of campaign finance sources statute, and this court rejected the challenge. 159 Wn.2d at 804-06 (citing and quoting RCW 42.17.120, *recodified as* 42.17A.435). But in that case, another factor seems to have been outcome determinative: the fact that the concealment of campaign finance sources was a civil, rather than a criminal, statute, and the general-specific rule was not designed for that situation. *Id.* at 806-07. In addition, in *Conte*, the civil campaign finance statute expressly allowed for "'other remedies provided by law'" and there was no indication of legislative intent to "supersede" the general law. *Id.* at 807 (emphasis omitted) (quoting RCW 42.17.390).

11

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

legislature would not promulgate such specific penalties, tailored to punish

organizational defendants, if it did not want prosecutors to use them.

      II.      EVEN UNDER THE MAJORITY'S HYPERTECHNICAL ANALYSIS, THE
              STATUTES ARE CONCURRENT

The majority acknowledges that the mental state element of the WISHA-

homicide statute (willfully and knowingly) will always satisfy the lower mental

state element of the manslaughter statute (recklessly or negligently). Majority at

10 (citing RCW 9A.08.010(2)). It emphasizes, however, the difference in "the

*object* of the mental state" between the two statutes and holds that that difference

undermines the concurrency between those two statutes. *Id.* at 10-11. It concludes

that because the misdemeanor statute prohibits willfully and knowingly *violating*

*safety rules and thereby causing death*, while the felony manslaughter statute

prohibits negligent or reckless disregard of *the possibility of death*, the statutes

cannot be concurrent. *Id.* It does not delve deeply into the legislature's goal in

enacting the WISHA-homicide statute, the context of the full WISHA enactment,

or the goal of encouraging misdemeanor prosecutions with their high monetary

penalties. It relies on *Gamble*, 154 Wn.2d 457, a case that never discussed the

general-specific rule, for this limited analysis. *Id.*

The majority's position is difficult to reconcile with the general-specific

rule. *Gamble* did not address the general-specific rule at all. Further, while there

12

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

is a bit more language in the WISHA statute, both statutes require an unbroken

chain of proximate causation from the defendant's action to the resulting death.

Under the WISHA-homicide statute, the employee death must be caused by the

safety rule violation that the employer knowingly violated. Under the

manslaughter statute, the death must be caused by the defendant's reckless or

criminally negligent action. In both circumstances, the defendant's action, with the

requisite mental state, must *cause* the death.

Given this causation requirement in both statutes, it is basically

inconceivable that a violation of the WISHA-homicide statute would not also

amount to a violation of the manslaughter statute. The reason is that if a defendant

willfully and knowingly violates a safety regulation, and "that [very] violation"

itself "*caus*[*es*] death," then the chances are pretty high that that defendant also

disregarded that very risk of that death.[10] Thus, even with alternate mens rea

---

[10] In other words, if the violation did not proximately cause the work site death, then there would be no criminal liability under either the WISHA-homicide or manslaughter statutes (because causation is an element of both). But if the violation *did* proximately cause the workplace death, then there could be criminal liability under both, because the proximate cause link will only exist where the outcome (death) was sufficiently predictable and direct. *See State v. Frahm*, 193 Wn.2d 590, 600, 444 P.3d 595 (2019) (Whether a "superseding cause" relieves a defendant of liability "'depends on whether the intervening act can reasonably be foreseen by the defendant; only intervening acts which are not reasonably foreseeable are deemed superseding causes.'" (internal quotation marks omitted) (quoting *Crowe v. Gaston*, 134 Wn.2d 509, 519, 951 P.2d 1118 (1998))). How could a dangerous condition addressed by a safety regulation give rise to a foreseeable death without negligence as to the risk of that death?

13

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

objects, the "general statute will be violated in each instance where the special statute has been violated." *Shriner*, 101 Wn.2d at 580. This is all that is required for concurrency.

The majority even seems to acknowledge that functionally, every WISHA violation will result in a manslaughter violation as well. Majority at 13-14 ("[I]t is not unusual in criminal law that multiple statutes can be violated by the same set of facts. Whether the State prevails will depend on whether it can prove the elements of the crime."). This reasoning sanctions duplicative charging, even in a situation where the legislature did not intend that outcome. That would dismantle the general-specific rule's purpose: judicial recognition of a legislative effort to cabin prosecutorial discretion.

CONCLUSION

The majority's overly technical concurrency analysis abandons the general-specific rule's fundamental purposes and prevents its application in all but the most particular and unusual scenarios. I would look to the context of this WISHA-homicide statute as part of a complete WISHA act designed to address workplace safety issues and penalties, and to incentivize charging in an undercharged area. That context shows that the legislature promulgated specific penalties for the specific offense Numrich allegedly committed. I would therefore hold that just as

14

*State v. Numrich (Phillip Scott)*, No. 96365-7
(Gordon McCloud, J., dissenting)

in *Walls*, *Collins*, and *Shriner*, the State must charge Numrich under the specific

statute—or not at all.

I respectfully dissent.

_____
Gordon McCloud, J.