[No. 11314-1-III.   Division Three.   July 2, 1992.]

JAMES A. BROWN, ET AL, *Respondents,* v. STATE FARM FIRE & CASUALTY COMPANY, ET AL, *Appellants.*

274

*William R. Hickman* and *Reed McClure; Richard C. Feltman* and *Feltman, Gebhardt, Eymann & Jones P.S.,* for appellants.

*Dennis P. Hession, Sonja L. Peterson,* and *Richter-Wimberley, P.S.,* for respondents.

THOMPSON, J. — State Farm Mutual Automobile Insurance Company appeals a judgment of $80,616.29 entered in favor of its insureds, James and Myrna Brown, in their action for declaratory relief. The Superior Court held the Browns were the owners of a motor home which was stolen after they paid for it and after it was delivered to the dealer's lot, but before they took actual physical possession. Thus, the loss was covered by the Browns' State Farm

policy, which provided for automatic coverage for newly acquired vehicles. The Superior Court also ordered State Farm to pay attorney fees the Browns incurred recovering the stolen motor home. We affirm.

On October 2, 1982, the Browns executed a retail order for the purchase of a 1983 Legend Mini-Home from R.V. Kingdom, Inc. Shortly thereafter, the Browns questioned the wisdom of their decision and attempted to withdraw their order. However, R.V. Kingdom, Inc., indicated it would hold the Browns to their agreement to purchase. On October 28, 1982, the Browns paid the full purchase price of $35,475.07 for the motor home, which included taxes and licensing fees.

On January 20, 1983, the motor home was delivered to R.V. Kingdom, Inc., by the manufacturer, along with title documents. On January 21, Peter Stout, one of the principals of R.V. Kingdom, Inc., executed a note and security agreement by which R.V. Kingdom, Inc., borrowed $24,626 from the Bank of Spokane and granted the Bank a security interest in the motor home. Sometime after January 21, the Browns went to R.V. Kingdom, Inc., inspected the vehicle, and accepted it as conforming to their contract. At that time, the Browns asked R.V. Kingdom; Inc., to keep the motor home on its lot and attempt to resell it. Pursuant to the advice of Kenneth Hutchinson, the other principal of R.V. Kingdom, Inc., the Browns did not have the Department of Licensing change title. Mr. Hutchinson also told the Browns R.V. Kingdom, Inc., had insurance that would cover the motor home while it sat on the lot.

Within 30 days, Mrs. Brown called their State Farm agent Robert Nebergall. The Browns had existing automobile insurance through State Farm. Mrs. Brown told Mr. Nebergall of their arrangement with R.V. Kingdom, Inc., for the resale of the motor home. He indicated they did not need to buy insurance until they removed the vehicle from the dealer's lot.

During the next year, the Browns kept in regular contact with R.V. Kingdom, Inc. On February 6, 1984, they decided to take the motor home from the lot. When they went to R.V. Kingdom, Inc., they learned the corporation and its principals had filed for bankruptcy in January 1984, and that the Bank of Spokane had repossessed their motor home. The Bank refused to concede the Browns had a superior interest in the vehicle, so the Browns filed suit to determine title in bankruptcy court on May 30, 1984. Mr. Hutchinson and Mr. Stout, the principals of R.V. Kingdom, Inc., were charged and convicted of criminal theft in connection with their pledging the Browns' motor home to the Bank.

On November 8, 1984, the Browns filed a claim for the loss of their motor home under their existing automobile insurance policy with State Farm. The insurance policy provided automatic coverage for thefts of newly acquired vehicles owned by the insureds.[1] When State Farm questioned the application of the policy provision to these facts, the Browns filed this action for declaratory relief. State Farm subsequently denied coverage and told the Browns: "We suggest that you take whatever measures you deem necessary to protect your interests in this matter."

The Browns determined that continuing their litigation in bankruptcy court with the Bank of Spokane was necessary to protect their interest in the motor home. On December 9, 1985, the bankruptcy court awarded them the home; the decision was reversed in district court on October 2, 1986, then reinstated by the Ninth Circuit Court of Appeals on February 1, 1988. When the Browns finally obtained

---

[1]The exact wording of the State Farm policy is as follows: "We will pay for *loss* to *your car* . . . but only for the amount of each such loss . . .

". . . *[L]oss* caused by . . . theft . . . is payable under this coverage.

"Newly Acquired Car — means a car newly owned by you or your spouse if it:
" . . . .
"2. is an added car . . .
" . . . .
"but only if you or your spouse:
"1. tell us about it within 30 days after its delivery to you or your spouse;"
(Italics ours.)

possession of the motor home in April 1988, its fair market value was only $17,000. They had incurred $33,772.71 in attorney fees.

After trial, the court concluded the Browns acquired a property interest in the motor home no later than January 20, 1983, when it was delivered to the R.V. Kingdom, Inc., lot. As of that date, the vehicle was "newly acquired" within the meaning of the Browns' insurance policy. It was therefore insured by State Farm when R.V. Kingdom, Inc., gave the Bank a security interest in it on January 21. The court held State Farm breached its contract with the Browns by denying coverage, and the Browns were entitled to recover as damages: $35,475.07, the value of the vehicle on the date of the theft; $33,772.71, the attorney fees and costs incurred in the recovery of the vehicle; $1,776.51, the cost of repair; and $480, the cost of storage. The judgment was then reduced by $17,000, the value of the vehicle when recovered. With prejudgment interest of $25,652 and statutory costs and attorney fees, the judgment totaled $80,616.29.

The first question is whether the motor home was "owned" by the Browns at the time of the theft, as that term is used in the "newly acquired vehicle" provision of the insurance contract. State Farm contends the Browns did not own the vehicle until the dealer physically delivered it to them, which occurred after the Bank obtained the security interest. On the other hand, the Browns contend physical possession is but one indicia of ownership and that under the facts present here, they owned the vehicle from the time it arrived on the R.V. Kingdom, Inc., lot.

State Farm relies upon RCW 62A.2-401, which reads:

*Insofar as situations are not covered by the other provisions of this Article* and matters concerning title become material the following rules apply:

. . . .

(2) Unless otherwise explicitly agreed *title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods,* despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; . . .[.]

(Italics ours.) According to State Farm, passage of title upon delivery of the vehicle under U.C.C. § 2-401(2) is equivalent to ownership. It cites cases from other jurisdictions which have quoted this section in determining whether a *seller's* insurance continued to provide coverage after delivery of a vehicle to a buyer. *Pekin Ins. Co. v. Charlie Rowe Chevrolet, Inc.*, 556 N.E.2d 1367 (Ind. Ct. App. 1990); *Smith v. Nationwide Mut. Ins. Co.*, 37 Ohio St. 3d 150, 524 N.E.2d 507 (1988); *Motors Ins. Corp. v. Safeco Ins. Co. of Am.*, 412 S.W.2d 584 (Ky. 1967).

The cited cases are distinguishable. The holdings do not support State Farm's assertion that a *buyer* can acquire ownership of personal property only upon the seller's physical delivery of the goods in question. While U.C.C. § 2-401(2) is relevant to the question of when a *seller's* ownership of goods terminates, other provisions of article 2 specifically address when a *buyer's* ownership commences.

■ ■ The Washington Comments to RCWA 62A.2-401 state that "[t]he rules as to location of title provided by this section are intended as a supplement to" other provisions of article 2. U.C.C. § 2-401 covers residual situations, such as questions involving the seller's ownership of goods, for which there is no specific code solution for a problem influenced by title concepts. 67 Am. Jur. 2d *Sales* § 387, at 654-55 (1985). In declaring the Browns were the owners of the motor home and automatically covered under the terms of their policy, the trial court relied upon the specific language of RCW 62A.2-501(1), which provides:

> The buyer obtains *a special property and an insurable interest* in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them.

(Italics ours.) The quoted section indicates that the term "ownership", when used in reference to a buyer, is broader than "title" and does not require the buyer be in actual receipt of the goods. *See* 6C W. Willier & F. Hart, *Uniform Commercial Code Reporter-Digest* § 2-501, at 2-464.2 (1984).[2]

---

[2]Insurance contracts are construed to maximize coverage in a fashion consonant with fairness to the insurer. *Oregon Auto. Ins. Co. v. Salzberg*, 85 Wn.2d

RCW 62A.2-501(1) accords with common law concepts of ownership. One commentator has defined that term, for purposes of the "newly acquired vehicle" clause, as "such ownership as an ordinary man ascribes to his own, the property right which he holds as owner, the right of user, and interest in its protection which goes with a sense of ownership." 12 R. Anderson, *Couch on Insurance* § 45:187, at 468 (2d ed. 1981). This definition incorporates the general rule of construction that language in insurance policies is to be interpreted in the manner in which it would be understood by the average person, and not in a technical sense. *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 907, 726 P.2d 439 (1986). *See also Gingrich v. Unigard Sec. Ins. Co.*, 57 Wn. App. 424, 430-32, 788 P.2d 1096 (1990), which relied upon the intent of the parties and the nature of the transaction in holding that a person other than the one in possession owned the vehicle even though the person in possession was the registered title holder.

Based upon RCW 62A.2-501(1), and the nature of this sales transaction, we hold the Browns were the owners of the motor home when it arrived on the lot at R.V. Kingdom, Inc., and was identified to their retail sales contract. They had paid for the vehicle in full, and they had the right and power to control it. All others, including R.V. Kingdom, Inc., could lawfully act in relation to the vehicle only in the Browns' behalf. The average person, in the Browns' situa-

---

372, 376-77, 535 P.2d 816 (1975); *Odessa Sch. Dist. 105 v. Insurance Co. of Am.*, 57 Wn. App. 893, 897, 791 P.2d 237, *review granted*, 115 Wn.2d 1007, *dismissed*, 115 Wn.2d 1022 (1990). The cited code provisions are consistent with this rule of construction. Maximum coverage is achieved by terminating the seller's ownership interest only upon actual delivery of the goods to the buyer, but not requiring actual delivery for a buyer to obtain an ownership interest in the goods.

U.C.C. §§ 2-401 and 2-501 are also consistent with the risk of loss provisions of the Uniform Commercial Code. U.C.C. § 2-509(3) places the risk of loss on a merchant seller until he physically delivers the goods to the buyer. That provision simply recognizes that a merchant in possession is more likely to insure the goods, even though the buyer has a property right to the goods and an insurable interest therein at the time of identification to the contract. *See* Official Comment 3, RCWA 62A.2-509.

tion, would believe he owned the motor home. Thus, the Superior Court correctly decided the Browns owned the motor home at the time of the theft.[3]

The second question is whether the Superior Court erred in awarding the Browns as damages against State Farm the attorney fees they incurred in the litigation to recover their motor home from the Bank. State Farm argues its liability is limited to the actual cash value of the vehicle, citing the policy language wherein it agreed to pay "for loss to your car . . . *but only for the amount of such loss . . .*". (Italics ours.) The Browns rely on a separate provision of the policy, which states:

> When there is a loss, you or the owner of the property also shall:
>
> . . . .
>
> b. protect the damaged vehicle. *We will pay any reasonable expense incurred to do it.*

(Italics ours.)

■■ We agree with the trial court that the term "damaged" in the above quoted section is ambiguous, and that, construing the term in the insured's favor, *see Glen Falls Ins. Co. v. Vietzke*, 82 Wn.2d 122, 126, 508 P.2d 608 (1973), it is not limited to physical damage but includes the impairment of title which occurred here. We also agree that State Farm is liable for the Browns' reasonable attorney fees incurred in protecting their title to the motor home.

---

[3]The other cases cited by State Farm are distinguishable on their facts. In *Ohio Cas. Ins. Co. v. Campbell*, 345 F.2d 11, 13 (6th Cir. 1965), the court denied the insured's claim for coverage under the newly acquired automobile provision of his policy. The insured had paid a minor for the vehicle, and the vehicle was damaged in an accident before the insured took delivery, and before the boy's father, the title holder, ratified the sale. This latter fact distinguishes *Campbell* from the instant case.

State Farm also relies upon *L'Allier v. Turnacliff*, 107 N.M. 382, 758 P.2d 796 (1988). There, the question was whether the buyer had notified his insurer of his "newly acquired" vehicle within 30 days of its delivery, as required by the policy. The court held that the 30 days ran from the date the insured took delivery of the vehicle, not from the later date when registered title was transferred. The court did not concern itself with the question before us — whether an ownership interest can arise before physical delivery takes place.

In *Talman Fed. Sav. & Loan Ass'n v. American States Ins. Co.*, 468 So. 2d 868, 873 (Miss. 1985), the court ordered the insurer to pay the reasonable attorney fees incurred by a mortgage holder in protecting its interest in a deed of trust. The mortgage holder had brought foreclosure proceedings after the insurer refused to pay the balance due on a note and deed of trust it held on a house destroyed by fire. The fire had been set by the homeowner, who was also the insured. Under Mississippi law, the insurer has an independent contractual obligation to pay the mortgage holder the amount owing on the debt, regardless of any wrongdoing by the insured. *Talman*, at 872-73.

In holding the insurer liable for the mortgage holder's attorney fees in the separate foreclosure and related actions, the *Talman* court reasoned:

> Had [the insurer] paid [the mortgage holder], it would have been subrogated to all [the mortgage holder's] rights, and also entitled to an assignment to it by [the mortgage holder] of the note and deed of trust. Following this assignment [the insurer] could have proceeded against the property and [the homeowners].
>
> Instead, it required [the mortgage holder] to institute foreclosure proceedings, go to Bankruptcy Court, and finally to the Chancery Court to protect its deed of trust and its interest in the property. In doing so *[the mortgage holder] was also protecting [the insurer], because [the insurer's] only hope to recover any sum from payment under the policy is as subrogee or assignee, or both, of the deed of trust.*

(Italics ours.) *Talman*, at 873. The court concluded that since the mortgage holder incurred attorney fees in protecting the rights the insurer as subrogee/assignee would eventually enjoy, it would be "unconscionable" not to require the insurer to pay a reasonable fee for such services. *Talman*, at 873. *See also* 6 J. Appleman, *Insurance* § 3885, at 382 (1972) (insured entitled to recover from insurer money paid detective agency in attempting to recover car) (citing *Buxton v. International Indem. Co.*, 47 Cal. App. 583, 191 P. 84 (1920)); *Gowans v. Northwestern Pac. Indem. Co.*, 260 Or. 618, 489 P.2d 947, 46 A.L.R.3d 398 (1971) (insured entitled to recover from insurer reward paid for return of stolen property).

■ Similarly, if State Farm had paid the Browns' claim when made, it would have been subrogated to the Browns' rights against the Bank. It did not pay, and the Browns were left with no practical choice but to continue their action in Bankruptcy Court and through the appeal to the Ninth Circuit. In doing so, they also protected State Farm, whose only chance in recouping any amount it owed the Browns under the policy was to recover the motor home. The fact the cost of the attorney fees eventually exceeded the benefit obtained from return of the motor home is irrelevant because the Browns' decision to proceed was reasonable at the time it was made. *Cf. Kubista v. Romaine*, 14 Wn. App. 58, 64, 538 P.2d 812 (1975) (reasonableness of expenses incurred in mitigating damages is not judged by hindsight) (quoting *Hogland v. Klein*, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956)), *aff'd*, 87 Wn.2d 62, 549 P.2d 491 (1976).

The separate policy provision limiting payment for vehicle loss to the amount of such loss is, by its very terms, applicable to payments for the loss itself. It does not limit State Farm's promise as set forth in the duty to protect clause. We therefore uphold the trial court's award of attorney fees as a reasonable expense incurred to protect the title-damaged motor home.[4]

We note our holding is supported by analogy to *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991). There, the court awarded the insured its attorney fees in a damage suit against the insurer. The court concluded at page 53: "[W]e believe that an award of fees is required in *any* legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract . . .". (Italics ours.)

---

[4]In its brief, State Farm argues that the insured's duty to protect is a condition precedent to the insurer's duty to pay. Therefore, the Browns were excused from performing the condition when State Farm refused to pay. While the Browns may have been able to assert State Farm's breach as a waiver of the condition, that breach did not prevent them from choosing to continue their performance under the contract, so long as continued performance was reasonable.

Here, State Farm's refusal to pay forced the Browns to continue their litigation with the Bank.

The final question is whether the trial court erred when it awarded the Browns the amount of fees they requested, without expert testimony that the amount was reasonable. Instead, the court concluded the fees were reasonable, based upon (1) its own familiarity with the Browns' attorneys, (2) their general reputation for competence in the legal community, and (3) its finding that the fees were within the range charged by other lawyers.

■ We agree with 2 S. Speiser, *Attorneys' Fees* § 18:14, at 478 (1973):

> Generally the testimony of expert witnesses [on the issue of the value of the services of an attorney] is not essential. The court, either trial or appellate, is itself an expert on the question of the value of legal services, and may consider its own knowledge and experience concerning reasonable and proper fees, and may form an independent judgment either with or without the aid of testimony of witnesses as to value.

(Footnotes omitted.)

While the fees awarded here were for work performed in the federal courts, the Superior Court had before it the findings and conclusions of the Bankruptcy Court, the opinion of the Ninth Circuit, and the affidavit of counsel detailing the work performed. The court found the issues were numerous and complex, the research and briefing were significant, and the Bank provided substantial opposition to the Browns, resulting in multiple hearings, numerous depositions, and a 3-day trial. The trial judge had enough information to award fees according to the method recited in *Singleton v. Frost*, 108 Wn.2d 723, 733, 742 P.2d 1224 (1987):

> [T]he trial court should consider the total hours necessarily expended in the litigation by each attorney, as documented by counsel, and . . . the total hours expended should then be multiplied by each lawyer's reasonable hourly rate of compensation considering *inter alia* the difficulty of the problem, each lawyer's skill and experience and the amount involved.

There was no error.

284

Affirmed.

SHIELDS, C.J., and MUNSON, J., concur.