## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

CAITLIN CROMAR and DAMON CROMAR,

                Appellants,

    v.

TAG REALTY, LLC,

                Respondent,

    and

1021 N 29TH STREET, LCC,

                Defendant.

No.87780-1-I

ORDER GRANTING
MOTION TO
PUBLISH OPINION

Non-parties, Northwest Justice Project, King County Bar Association Housing Justice Project, Kitsap Legal Aid Services, and Sound Legal Aid, having filed a motion to publish opinion, and the panel having considered the motion, and finding that the opinion dated November 17, 2025 will be of precedential value; now, therefore it is hereby

ORDERED that the unpublished opinion filed November 17, 2025 shall be published.

FOR THE COURT:

_____
Coburn, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CAITLIN CROMAR and DAMON CROMAR, | No. 87780-1-I |
| Appellants, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| TAG REALTY, LLC, | |
| Respondent, | |
| and | |
| 1021 N 29TH STREET, LCC, | |
| Defendant. | |

COBURN, J. —Caitlin and Damon Cromar successfully obtained a judgment against TAG Realty, LLC (TAG Realty) for its unlawful withholding of their security deposit in violation of Washington's Residential Landlord Tenant Act (RLTA), chapter 59.18 RCW. The trial court granted the Cromars' motion for attorney fees under RCW 59.18.280(2). The Cromars appeal the trial court's attorney fee order, arguing that the court abused its discretion by significantly reducing their requested fee amount without conducting a proper lodestar analysis. We affirm in part, reverse in part, and remand for the trial court to determine an attorney fee award consistent with this opinion.

FACTS

The Cromars married in September 2022. That same month they renewed a one-

year lease for a rental home with the property management company TAG Realty. As a condition of the lease, the Cromars provided a security deposit in the amount of $2,200.[1] The lease provided:

> If Tenant vacates prior to the Expiration Date (as extended, if applicable), the security deposit shall be forfeited and Tenant shall be obligated for rent payments for the remainder of the term, or until the Property has been re-rented whichever is less.

Upon purchasing a home, the Cromars notified TAG Realty in February 2023 that they would be terminating their lease early. They moved out of the rental home at the end of March. On April 5 TAG Realty emailed a move-out statement to the Cromars. The statement, titled "EARLY TERMINATION SECURITY DEPOSIT FORFEIT," deducted $1087.19 from the Cromars' security deposit for touch-up painting and the replacement of one blind. The statement provided that the balance of the Cromars' deposit was due to TAG Realty and stated at the bottom, "**No refund due to tenants due to early termination**." The next day, the Cromars sent a letter to TAG Realty requesting that the balance of their security deposit be returned on the ground that forfeiture of the deposit due to early lease termination is not permitted under the RLTA.[2] On April 24 TAG Realty responded to the email:

> We received your letter from the mail, again as per the lease agreement, you terminated the lease early so the security deposit will be forfeited thanks!

The Cromars then obtained legal assistance to prosecute their rights under the RLTA. They hired the firm Anderson Santiago, PLLC, and were assisted by counsels Jason D. Anderson and T. Tyler Santiago.[3]

---

[1] The security deposit was carried over from the plaintiffs' initial lease.
[2] In the letter, plaintiffs noted that TAG Realty rescinded its initial charge for the blind.
[3] The record shows that the firm started billing for work for the plaintiffs in July 2023.

In August TAG Realty sent an email to the Cromars offering to refund the balance of the security deposit to avoid litigation. The email does not reference TAG Realty's obligations under the RLTA or offer to compensate the Cromars for any legal fees or costs incurred.

In September the Cromars brought a putative class action complaint against TAG Realty for claims under the RLTA and Washington's Consumer Protection Act (CPA), chapter 19.86 RCW. As part of their class claims, the Cromars alleged that TAG Realty withheld their and other tenants' security deposits based on an unlawful lease agreement provision in violation of the RLTA. Additionally, they alleged that the lease provision "allowing a deposit to be forfeited is an unfair or deceptive act or practice" in violation of the CPA. They also raised individual RLTA and CPA claims against defendant Bohmann & Co., LLC (Bohmann), who allegedly owned the rental house that the Cromars lived at.

In their complaint, the Cromars requested certification under CR 23 for two proposed classes:

> The first proposed class … includes: All persons in the State of Washington who signed a lease with TAG [Realty] containing a deposit forfeiture provision herein described, which constitutes violations of the [CPA].
> …
> The second proposed class … includes: All persons in the State of Washington who signed a lease with TAG [Realty] and who did have some or all of such deposit forfeited, voided, or otherwise confiscated (and thus retained by TAG [Realty] or its principals), which constitutes violations of the [RLTA].

In TAG Realty's answer, it denied that its lease agreement with the Cromars contained a security deposit forfeiture provision that was illegal under the RLTA but admitted that it "unknowingly and in reliance upon prior court orders, lease form

3

publications, and established practice retained deposit that it now knows was improper because the remedy for early termination is statutorily defined." TAG Realty also denied that it was liable for violations of the CPA "by having [the Cromars] and class members sign an agreement allowing a deposit to be forfeited." TAG Realty asserted 15 affirmative defenses and "reserve[d] the right to plead further answer, affirmative defenses, counterclaims and/or third-party claims as investigation and discovery may warrant." TAG Realty requested the court deny the Cromars' alleged class, dismiss the complaint with prejudice, and award TAG Realty its costs and attorney fees.[4]

On September 6, 2024, TAG Realty responded to the the Cromars' first set of interrogatories and admitted that it withheld security deposits for 13 additional tenants' early lease terminations since September 8, 2019. TAG Realty noted that discovery was ongoing and reserved the right to supplement its answer.

On December 20 the Cromars moved for summary judgment on their individual RLTA claim and relinquished their class claims and individual CPA claim. In their motion, the Cromars cited TAG Realty's above-mentioned answer to interrogatories and explained that discovery revealed there was a lack of numerosity to move forward with their class claims.

On January 13 TAG Realty filed a notice of non-opposition to the Cromars' summary judgment motion. The trial court granted summary judgment to the Cromars the next day. The court found there was no genuine issue of material fact that TAG Realty retained a portion of the Cromars' security deposit based on an unlawful deposit

---

[4] Plaintiffs later amended their complaint to substitute Bohmann with 1021 N 29th Street, LLC as the correct owner of the subject rental home, but that company was later dismissed through a joint motion. The court noted that the plaintiffs and "1021 N 29th Street, LLC shall each bear their own fees and costs as to those dismissed claims."

forfeiture provision in the parties' lease agreement in violation of the RLTA. See Gebreseralse v. Columbia Debt Recovery, 24 Wn. App. 2d 650, 659-60, 521 P.3d 221 (2022); RCW 59.18.310.

Accordingly, the trial court found TAG Realty was liable to the Cromars for the full amount of the $2,200 security deposit. See RCW 59.18.280(2). Additionally, the court found that TAG Realty's withholding of the security deposit was intentional under RCW 59.18.280(2) and thus awarded the Cromars double damages for a total of $4,400. It is undisputed that TAG Realty did not return the Cromars' security deposit until the entry of the trial court's summary judgment order. The trial court also found that the Cromars were entitled to attorney fees and costs under RCW 59.18.280(2) upon their timely motion. See CR 54(d).

On January 21 the Cromars moved for attorney fees of $31,682.50 and costs of $445.97 for work completed by counsels Anderson and Santiago. The Cromars requested fees for 52.9 hours based on Anderson's hourly rate of $680 and Santiago's hourly rate of $565. The Cromars submitted counsels' time records, showing hours for specific services performed by Anderson and Santiago. In supporting declarations, Anderson and Santiago testified that they generally represent clients on a contingent fee basis and that other potentially capable attorneys often turn clients away for cases like the Cromars' because of client's inability to pay or the uncertainty of the outcome. Counsels testified that the number of hours they spent on litigation for the Cromars were reasonable and necessary to achieve the successful outcome.

Anderson testified that his reasonably hourly rate is $680 as of 2025, which "represents a modest 4.6% increase from my 2024 rate ($650/hour)." He testified that

5

about a year after he graduated law school in 2006 he worked at a nationwide law firm, where he became a partner and represented major national banks and debt buyers for debt collection and compliance matters before eventually founding his current firm in late 2014. Anderson stated that Anderson Santiago, PLLC is "a boutique litigation firm focused on protecting the rights of individuals who are facing abusive debt collection efforts and other related matters." He stated that his services are sought because of his reputation in handling abusive debt collection practices and experience working with debt collectors, and "[s]ubsumed" in his hourly rate was his prior experience in debt collection, the location of his office in the Seattle metro area, and the "current elevated rates of inflation." Anderson identified the greater Seattle area as the relevant legal community for comparison for legal services and other costs.[5]

In his supporting declaration, Santiago testified that his experience in debt collection matters has stemmed from his practice at Anderson Santiago, PLLC, which he founded with Anderson. Santiago stated that his hourly rate is $565 as of 2025, which "is a reasonable rate in light of not only my number of years of experience, but also the type of experience … with matters that frequently arise in connection with unlawful practices against consumers." Santiago testified that the $565 hourly rate accounted for his past trial experience as a deputy prosecuting attorney, experience in the debt collection industry, the location and associated costs of the firm's Seattle metro office, and the "current elevated rates of inflation."[6]

The Cromars also submitted a declaration from trial attorney Bradford J. Fulton

---

[5] Anderson attached to his declaration three prior orders granting attorney fees based on hourly rates of $650 and $545.

[6] Santiago attached two prior orders granting attorney fees based on hourly rates of $500 and $450.

who testified that he has more than 35 years of legal practice experience. Fulton testified that he conducted a careful review of counsels' time records and opined that their reported number of hours—which equated to 1.5 weeks of full-time work—was conservative, reasonable, and necessary to achieve the successful result and evidenced "excellent billing judgment and work efficiency." Fulton testified that in his experience, drafting summary judgments alone can require 30 to 40 hours of work. Here, Fulton noted, counsels met with the Cromars, evaluated their legal issues, drafted a summons and complaint, conducted discovery, corresponded with defense counsel, drafted summary judgment motion, communicated with trial court and the Cromars, and drafted attorney fee motion. Fulton emphasized that counsels' work achieved an excellent outcome for the Cromars; "a victory on summary judgment with double damages …. [, which] represents a complete recovery plus all available additional damages."

Considering the power disparity between landlords and tenants, Fulton also opined that the Cromars were fortunate to find competent counsel willing and able to assume the risks in representing them on a contingent-fee basis and that, aligned with the purpose of the RLTA, counsels were able to achieve an outcome that made the Cromars whole and deterred future unlawful conduct. Fulton testified that a court's failure to make fair and reasonable fee awards in such matters, individuals like the Cromars would be unable to find experienced or competent counsel willing to take on their cases to hold debt collectors accountable.

TAG Realty filed an opposition, arguing in part that the Cromars' requested attorney fees should be reduced because counsels' hourly rates were unreasonable

and some of the billed work was unproductive and did not contribute to the success of the Cromars' claim. TAG Realty identified only 2.9 hours of work that it specifically challenged as unproductive, which consisted of time the Cromars' counsel Anderson had devoted to "emails sent to … [TAG Realty's] counsel regarding settlement." TAG Realty did not identify any other work it asserted was unproductive, beyond simply arguing as a generalized matter that the fees incurred were "not warranted given the amount of money in controversy." The balance of TAG Realty's opposition to counsels' fee request was limited to challenging counsels' hourly rates. The sole competent evidence regarding attorney rates that TAG Realty submitted was its counsel's testimony, "My hourly billable rate in this matter is $275/hour." TAG Realty's counsel did not describe the manner in which his rate was established, nor his experience or reputation in the legal market.[7] The trial court awarded the Cromars $7,200 in attorney fees and $445.97 in costs. This award was less than a quarter of the fees that they requested.[8]

Regarding counsels' hourly rate, the court found that the rates were not reasonable based on the experience, skill, and education of Anderson and Santiago. Based on its knowledge, the court found that reasonable hourly rates in the Seattle legal market given each counsel's experience, skill, and education was $500 for Anderson

---

[7] TAG Realty also offered a link to an unauthenticated website that counsel reported stated "[t]he average hourly attorney rate in Washington is $322.00." Besides being unauthenticated and inadmissible hearsay, as an "average" the evidence is also irrelevant. Even if a statewide "average" rate for all lawyers handling all kinds of matters could be established through competent evidence, that alone would do nothing to shed light on the reasonable rate for a particular lawyer, with particular expertise, in a particular market, handling a particular kind of case. Thus, the described "average" rate was inadmissible independently under ER 402, 802, and 901.

[8] The trial court did not reduce the award for plaintiffs' legal costs.

and $450 for Santiago.

The court entered the following findings of fact:[9]

> The Court finds that the number of hours incurred by Plaintiffs' counsel were not reasonable. This case was filed as a putative class action. That threat drastically limited the possibility of reaching a negotiated resolution. Once the class claims were abandoned, … [TAG Realty] took little time conceding to entry of judgment. But by then the plaintiffs had incurred significant fees, again limiting the possibility of reaching a negotiated resolution. Had the lawsuit instead been brought simply to recover the plaintiffs' damages (the "successful result," … [Mahler v. Szucs, 135 Wn.2d 398, 434, 957 P.2d 632 (1998)]), a negotiated resolution may have been reached early, and, if not, the plaintiffs' lawyers could have immediately sought summary judgment on what was a very straightforward claim. Instead, the plaintiffs approached the case as a class action, including propounding and reviewing discovery relevant to proving class claims. … That work—prosecuting the matter as a putative class action—was devoted to "unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time" and must be excluded. … [See Chuong Van Pham v. City of Seattle, 159 Wn.2d 527, 538, 151 P.3d 976 (2007)]. Even work devoted to proving the plaintiffs' individual claim was "unproductive" in that, had the class claims not been pursued, the plaintiffs could have reached a resolution (whether negotiated or by court order) with far fewer hours expended. The Court finds that, at most, sixteen (16) hours were reasonably expended (including fees on fees) on prosecution of this matter.

The court concluded that "[g]iven that approximately half of the work was accomplished by each lawyer," the lodestar should be computed as the total of eight hours of work by Anderson plus eight hours of work by Santiago.

The Cromars appeal.

### DISCUSSION

### Trial Court's Attorney Fees Order

We review a trial court's decision regarding the amount of an attorney fee award

---

[9] The trial court judge based its order on plaintiffs' proposed order but struck through undesired language and added new italicized language noted with judge's initials. Such alterations are omitted for ease of reading.

for abuse of discretion. <u>Mayer v. City of Seattle</u>, 102 Wn. App. 66, 79, 10 P.3d 408 (2000); <u>see, e.g.</u>, <u>Chuong Van Pham v. Seattle City Light</u>, 159 Wn.2d 527, 538-40, 151 P.3d 976 (2007) (applying standard). A trial court abuses its discretion when it makes a decision that is manifestly unreasonable, based on untenable grounds, or if no reasonable person would take the position adopted by the trial court. <u>Mayer</u>, 102 Wn. App. at 79 (citing <u>Allard v. First Interstate Bank of Wash., N.A.</u>, 112 Wn.2d 145, 148-49, 768 P.2d 998 (1989)).

In calculating the reasonable amount of attorney fees, a trial court should apply the lodestar method. <u>Mahler v. Szucs</u>, 135 Wn.2d 398, 433, 957 P.2d 632 (1998). The lodestar method requires that a trial court conduct a three-part analysis. First, the court must determine that counsel spent a reasonable number of hours in obtaining a successful recovery for the client. <u>Id.</u> at 434; <u>see also</u> <u>Berryman v. Metcalf</u>, 177 Wn. App. 644, 662, 312 P.3d 745 (2013) ("The lodestar must be limited to hours reasonably expended."). Second, the trial court must determine "the reasonableness of the hourly rate of counsel at the time the lawyer actually billed the client for the services." <u>Mahler</u>, 135 Wn.2d at 434. Lastly, the trial court must calculate the lodestar fee award "by multiplying the reasonable hourly rate by the reasonable number of hours incurred," which the trial court may adjust up or down in "rare instances." <u>Id.</u>

To show that it exercised its discretion and did not unquestionably accept fee affidavits submitted by counsel, trial courts must make an adequate record upon which they base an attorney fee award. <u>Id.</u> at 434-35. That is, a trial court must provide articulable grounds for its attorney fee award to allow meaningful appellate review. <u>Taliesen Corp. v. Razore Land Co.</u>, 135 Wn. App. 106, 146-47, 144 P.3d 1185 (2006);

<u>Peiffer v. Pro-Cut Concrete Cutting & Breaking Inc.</u>, 6 Wn. App. 2d 803, 833, 431 P.3d 1018 (2018). Courts must enter findings of fact and conclusion of law to establish a proper record. <u>Mahler</u>, 135 Wn.2d at 435. Findings need not include explicit and detailed hour-by-hour analysis of each lawyer's time sheets, but they must articulate the relevant factors and reasons the court relied on to allow appellate review of the awarded amount. <u>Absher Const. Co. v. Kent Sch. Dist. No. 415</u>, 79 Wn. App. 841, 848, 917 P.2d 1086 (1995); <u>see also</u> <u>Berryman</u>, 177 Wn. App. at 658 ("The findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis."); <u>Mayer</u>, 102 Wn. App. at 82-83 ("Because the trial court made no findings regarding the specific challenged items, the record does not allow for a proper review of these issues.").

To provide an adequate record for review, "'[a]n [attorney fee] award of substantially less than the amount requested should indicate at least approximately how the court arrived at the final numbers, and explain why discounts were applied.'" <u>Peiffer</u>, 6 Wn. App. 2d at 833 (first alteration in original) (quoting <u>Absher Const. Co.</u>, 79 Wn. App. at 848). This entails the trial court explaining "'what part of the lawyer's work the court discounted as unnecessary or unreasonable … or the manner by which the court reduced.'" <u>Id.</u> at 834 (quoting <u>Progressive Animal Welfare Soc'y v. Univ. of Wash.</u>, 54 Wn. App. 180, 187, 773 P.2d 114 (1989), <u>rev'd on other grounds</u>, 114 Wn.2d 677, 790 P.2d 604 (1990)).

The Cromars contend that the trial court abused its discretion when it reduced their attorney fee award based on its assessment of counsels' hourly rates and time reasonably spent on the case. We conclude that the trial court did not abuse its

discretion in its determination as to hourly rates but abused its authority in its determination of reasonable hours and thus erred in its calculation of the lodestar amount.

*A. Reasonable Hourly Rates*

The Cromars argue that the trial court abused its discretion when it disregarded unrefuted evidence submitted in support of counsels' hourly rates of $680 and $565.

We first note that the Cromars' assertion that it submitted unrefuted evidence in support of counsels' hourly rates is not supported in the record. In support of its opposition to the attorney fee request, TAG Realty submitted evidence that its counsel's hourly rate was $275. See Absher Const. Co., 79 Wn. App. at 847 (stating that a trial court may consider the hourly rate of opposing counsel in its determination of reasonable attorney fee) (citing Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 66, 738 P.2d 665 (1987)).

Regardless, an attorney's usual hourly rate is not conclusively a reasonable rate, and the court may determine that adjustment to the hourly rate is necessary based on other factors even where the opposing party does not object to the hourly rate. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983); see Nordstrom, Inc. v. Tampourlos, 107 Wn.2d 735, 744, 733 P.2d 208 (1987). The trial court may consider factors such as the attorney's skill level and local rates charged by attorneys with similar skills and experience. Baker v. Fireman's Fund Ins. Co., 5 Wn. App. 2d 604, 623, 428 P.3d 155 (2018); Bowers, 100 Wn.2d at 597; see also Mahler, 135 Wn.2d at 433 n.20 (citing RPC 1.5(a)). "[A] trial court has the inherent knowledge and experience to evaluate the reasonableness of an hourly rate." State v. Numrich,

12

197 Wn.2d 1, 31, 480 P.3d 376 (2021). "The court ... is itself an expert on the question of the value of legal services, and may consider its own knowledge and experience concerning reasonable and proper fees, and may form an independent judgment either with or without the aid of testimony of witnesses as to value." Brown v. State Farm Fire & Cas. Co., 66 Wn. App. 273, 283, 831 P.2d 1122 (1992) (quoting STUART M. SPEISER, ATTORNEY'S FEES § 18:14, at 478 (1973)).

Here, the record supports that the trial court reviewed the Cromars' evidence and found that the hourly fees of $680 for Anderson and $565 for Santiago were not reasonable based on their respective experience, skill, and education. Both Anderson and Santiago stated in their declarations that their proposed hourly rates were based on their individual experience in debt collection matters, their Seattle location, and inflation. The Cromars further submitted evidence that the greater Seattle area was the relevant legal community for rate comparisons. The trial court was otherwise permitted, as it did here, to employ its own knowledge of what constituted reasonable hourly rates for Seattle attorneys of similar skill and experience. See Numrich, 197 Wn.2d at 31-32. Based on the standard of review, we cannot conclude that the trial court abused its discretion in discounting the hourly rates of the Cromars' attorneys.

B. Reasonable Hours

The Cromars next contend that the trial court abused its discretion when it did not apply a proper lodestar analysis in its arbitrary determination that only 16 of 52.9 of counsels' hours were reasonably spent on the Cromars' case.

The trial court provided two grounds for its reduction of the submitted hours: (1) that the Cromars' counsels' case management unnecessarily prolonged the case by

13

stunting the possibility of a settlement with TAG Realty and (2) that some of the hours were spent on unsuccessful efforts.[10] The court erred in both respects.

First, the trial court improperly based the reduction of attorney fees on the finding that the Cromars' pursuit of a class action resulted in wasteful and inefficient work because it restricted the possibility of a negotiated resolution with TAG Realty. To begin, TAG Realty never argued that the Cromars' class allegations either resulted in wasteful work or impeded settlement. The trial court's conclusion that it did is based on nothing in the record. Nor does anything in the trial court's order reflect scrutiny of the submitted time records to attempt to support its hypothesis. In its lodestar determination of reasonably expended attorney hours, a trial court must exercise its discretion to discount hours spent on unsuccessful theories or claims, wasteful or duplicated effort, or unproductive time. Mahler, 135 Wn.2d at 434; Bowers, 100 Wn.2d at 597. However, even if there had been support for the trial court's hypothesis, we have previously held that an attorney fee award should not be reduced for unreasonableness in settlement. Ewing v. Glogowski, 198 Wn. App. 515, 522-23, 394 P.3d 418 (2017). Evidence of conduct or statements made in negotiations is not admissible to prove the validity of the claim or its amount. ER 408. "Evidence of settlement negotiations of an underlying claim are not admissible as to proving attorney fees for that claim." Id. at 522 (citing Humphrey Indus., Ltd. v. Clay St. Assocs., LLC, 170 Wn.2d 495, 508, 242 P.3d 846 (2010)).

Moreover, the trial court's analysis that the Cromars should have resolved the

---

[10] Plaintiffs also argue that it is not proper for the trial court to consider the amount in controversy in attorney fee determinations under the RLTA. Because the court did not base its ruling on the amount in controversy, we need not address this argument.

case earlier by achieving a settlement is particularly unfair where the only work that TAG Realty claimed was wasteful was time that the Cromars' counsel spent on communicating with opposing counsel about a possible settlement. It is undisputed that TAG Realty never paid its liability to the Cromars until they obtained summary judgment after having been forced to litigate their right to their security deposit for months. Then, TAG Realty argued that the Cromars' counsel's communication regarding settlement was a waste of their time. Even then, in arguing that the Cromars incurred unnecessary attorney fees, TAG Realty argued, "This is a straight-forward issue which could have been successfully handled by a legal aid clinic, a general practitioner, or a recently admitted attorney." In other words, TAG Realty itself admits that its refusal to return the Cromars' deposit was so patently illegal that even a new attorney could have recognized it. Surely, then, TAG Realty and its lawyer could have recognized it. For TAG Realty to argue, and for the trial court to rule, that the very obviousness of TAG Realty's violation is a reason why the Cromars should be denied recovery of their attorney fees to prosecute it inverts the proverbial cart and the horse and offends basic notions of fairness.

Second, the trial court's finding that the Cromars' pursuit of a class action led to attorney efforts that did not contribute to the success on their individual claims is not supported by law or fact.

Where attorney fees are recoverable for only some of a party's claims, the trial court's award must segregate the time spent on claims for which attorney fees are authorized from time spent on other non-recoverable or unsuccessful claims. Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now (C.L.E.A.N.), 119

Wn. App. 665, 690-91, 82 P.3d 1199 (2004). However, where a plaintiff's claims for relief involve a common core set of facts or are based on related legal theories, a trial court should not view a lawsuit as a series of discrete claims and therefore should not segregate the claims in determining an award of fees. Fiore v. PPG Indus., Inc., 169 Wn. App. 325, 352, 279 P.3d 972 (2012) (citing Brand v. Dep't of Lab. & Indus., 139 Wn.2d 659, 672-73, 989 P.2d 1111 (1999)).

Thus, a trial court must first determine if claims are reasonably segregable, and if so, the court must separate the time spent on claims or theories essential to the cause of action for which fees are authorized and counsel time spent on theories relating to other causes of action. Loeffelholz, 119 Wn. App. at 690-92; Travis v. Wash. Horse Breeders Ass'n, 111 Wn.2d 396, 410-11, 759 P.2d 418 (1988). "'This must include, on the record, a segregation of the time allowed for the [separate] legal theories.'" Loeffelholz, 119 Wn. App. at 691 (alteration in original) (quoting Travis, 111 Wn.2d at 411); see, e.g., Chuong Van Pham, 159 Wn.2d at 539-40 (upholding trial court's reduction of fees where it, in part, "took care to reduce the fees only in proportion to the amount of time devoted to … specific tasks [related to plaintiffs' successful claim]"). A failure to do so results in an arbitrary award not supported by the record that constitutes an abuse of discretion. Loeffelholz, 119 Wn. App. at 692.

Here, the trial court did not conduct the proper analysis to determine whether, as a threshold issue, time spent on the Cromars' class action claims was segregable from time spent on their individual claims. This required the court to determine whether the record supported that the class claims were based on different facts and legal theories than the individual claims. Fiore, 169 Wn. App. at 352; see Loeffelholz, 119 Wn. App. at

690-93. As referenced above, TAG Realty did not even argue that the Cromars' class allegations resulted in wasteful work. Instead, the court's order shows that the most it did was disparage the Cromars' pursuit of a class action for "a very straightforward claim" and effectively presume that time spent on class action-related discovery was excludable. Not only does the order rely on an argument TAG Realty never made and for which there is no factual support, it also disregards the issues that were disputed and the inherent reasonableness of the Cromars' counsels' limited discovery.

Once counsel has elected to take a case, even a small one resulting from a residential damage deposit, the Rules of Professional Conduct do not give counsel leeway to skip over a reasonable investigation of their client's rights, as the trial court's order seems to envision. See RPC 1.2(a), 1.3 & cmt. 1. Had the trial court addressed the claimed time in its order, it would have discovered that counsels devoted a mere 8.1 hours to billable discovery. This included 3.3 hours drafting discovery to TAG Realty, 2.3 hours reviewing its responses and seeking the supplementation promised by TAG Realty, 0.3 hours in three entries following up on the supplementation, and 2.2 hours reviewing the supplemental information. As noted above, this led to counsels' conclusion that those affected by TAG Realty's illegally withheld deposits were too few to likely obtain class certification. Surely the more prudent thing was for counsels to invest these few hours in ascertaining whether a class was appropriate, rather than wasting their and the court's time in aggressively pursuing an unjustified motion. Unfortunately, the trial court's hindsight complaint that this case concerned only the Cromars' rights after all would mean that, next time, plaintiffs' counsel should not even inquire about whether class allegations are justified. As discussed further below, this is

17

blatantly deleterious to the enforcement of the RLTA. <u>See</u> <u>Silver v. Rudeen Mgmt. Co., Inc.</u>, 197 Wn.2d 535, 544, 546-48, 484 P.3d 1251 (2021).

Moreover, the discovery was relevant to the Cromars' RLTA claim, too. As noted, discovery yielded the information that, besides the Cromars, TAG Realty illegally stole tens of thousands of dollars from at least 13 other tenants. Even if the Cromars' counsel made the reasonable judgment that 13 was too few potential class members to meet the numerosity requirement of CR 23, the discovered information nevertheless evidenced TAG Realty's "intentional refusal" to give the refund due, and so was directly relevant to the Cromars' own claim under RCW 59.18.280(2).

The court's order also provides no explanation as to what tasks were included in the compensable 16 hours and what purportedly segregable tasks the remaining 36.9 hours were spent on to justify their exclusion. <u>See</u> <u>Loeffelholz</u>, 119 Wn. App. at 691.

The trial court's authorizing a residential tenant no more than two day's worth of attorney time to contest their landlord's illegal withholding of a security deposit simply tips the economic scales in the landlord's favor to withhold deposits at will. The trial court's reduction of the Cromars' fees based on conclusory findings not grounded in the law is an abuse of its authority.

Additionally, the trial court's plain disapproval of the Cromars' efforts to vindicate their and other tenants' rights through a class action indicates that the court failed to consider the purpose of an attorney fee award under the RLTA. A trial court must consider the purpose of the statute that provides the basis for attorney fees in its determination of the amount of an attorney fee award. <u>Berryman</u>, 177 Wn. App. at 668 (citing <u>Scott Fetzer Co. v. Weeks</u>, 122 Wn.2d 141, 149, 859 P.2d 1210 (1993); <u>Brand</u>,

18

139 Wn.2d at 667). Because "attorney fees statutes may serve different purposes, it is important to evaluate the purpose of the specific attorney fees provision and to apply the statute in accordance with that purpose." Brand, 139 Wn.2d at 667. "A statute's mandate for liberal construction includes a liberal construction of the statute's provision for award of reasonable attorneys' fees." Progressive Animal Welfare Soc'y v. Univ. of Wash., 114 Wn.2d 677, 683, 790 P.2d 604 (1990); accord Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 713, 9 P.3d 898 (2000) (discussing Brand, 139 Wn.2d at 667-71).

Here, the legal basis for the Cromars' attorney fee award under RCW 59.18.280(2) of the RLTA is undisputed. It has long been established that "[th]e RLTA is a remedial statute that must be 'construed liberally in order to accomplish the purpose for which it is enacted.'" Silver, 197 Wn.2d at 548 (quoting State v. Douty, 92 Wn.2d 930, 936, 603 P.2d 373 (1979)). "The RLTA specifies numerous duties, rights, and remedies for landlords and tenants engaged in residential lease agreements." Id. at 543. The RLTA's regulations in landlord-tenant law supplanted many common law rules, "most notably by placing affirmative duties on the landlord." Id. at 544. In doing so, the RLTA seeks "'to protect tenants' rights by creating incentives for landlords to improve the quality of rental housing.'" Id. (quoting Christopher W. Sullivan, Forgotten Lessons from the Common Law, the Uniform Residential Landlord and Tenant Act, and the Holdover Tenant, 84 WASH. U. L. REV. 1287, 1312 (2006)). Because it is a "statute[ ] in derogation of the common law," the RLTA must be "strictly construed in favor of the tenant." Randy Reynolds & Assocs., Inc. v. Harmon, 193 Wn.2d 143, 156, 437 P.3d 677 (2019).

19

In Silver, our Supreme Court observed that the RLTA creates remedies to protect tenant interests vulnerable to the power disparity that exists between tenants and landlords who have the upper hand in housing disputes. 197 Wn.2d at 544, 547-48. One of the most frequent landlord-tenant disputes deal with tenant complaints of a landlord's wrongful retention of damage and security deposits. Id. at 544 (citing William B. Stoebuck, The Law Between Landlord and Tenant in Washington: Part II, 49 WASH. L. REV. 1013, 1032 (1974)). In response, the legislature enacted "new and significant regulation" through the RLTA to specifically address security deposit issues. Id. (citing Stoebuck, supra, at 1032); see RCW 59.18.260, .270, .280. "Under the RLTA, the tenant's deposit provides security for the performance of the tenant's obligations under the lease, but '[n]o part of the deposit belongs to the landlord unless and until the tenant breaches.'" Silver, 197 Wn.2d at 545 (alteration in original) (quoting 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 6.53, at 398 (2d ed. 2004)).

To further protect tenant interests, the attorney fee provision under RCW 59.18.280(2)[11] authorizes tenants to recover fees and costs where a landlord fails to

---

[11] RCW 59.18.280(2) states:

If the landlord fails to give the statement and any documentation required by subsection (1) of this section together with any refund due the tenant within the time limits specified in subsection (1) of this section he or she shall be liable to the tenant for the full amount of the deposit. The landlord is also barred in any action brought by the tenant to recover the deposit from asserting any claim or raising any defense for retaining any of the deposit unless the landlord shows that circumstances beyond the landlord's control prevented the landlord from providing the statement and any documentation within the 30 days or that the tenant abandoned the premises as defined in RCW 59.18.310. The court may in its discretion award up to two times the amount of the deposit for the intentional refusal of the landlord to give the statement, documentation, or refund due unless the landlord shows that circumstances beyond the landlord's control prevented the landlord from providing the statement and any such documentation within 30 days or that the tenant abandoned the premises as described in RCW 59.18.310.

comply with the RLTA's security deposit provisions. Silver, 197 Wn.2d at 548-49.[12] The subsection also provides for double damages if the landlord's violation is intentional. RCW 59.18.280(2).

The Silver court particularly observed the value of class actions in the context of tenants' collective recovery of unlawfully withheld security deposits. 197 Wn.2d at 547-48. Though a security deposit may be a significant amount of money to the tenant, renters—especially low-income renters—may be unable to afford legal representation to recover their wrongfully withheld deposit and damage awards are often too small to be worth a litigator's financial investment. Id.; see also id. at 547 (noting that tenants experiencing poverty often face security deposits and moving expenses that exceed their monthly income) (citing Kathryn A. Sabbeth, (Under)Enforcement of Poor Tenants' Rights, 1 GEO. J. ON POVERTY L. & POL'Y 97, 110 (2019)). The RLTA's provisions authorizing attorney fees and double damages and the availability of class actions "demonstrate the importance of statutes that impose strict obligations and meaningful remedies to hold landlords accountable to respecting tenants' rights." Id. at 546-48.

Like in Silver, the Cromars in the instant case sought a class action to recover double damages for their unlawfully withheld security deposit and for other similarly wronged tenants under the RLTA. See 197 Wn.2d at 547-48 & n.11. The record supports that the Cromars were compelled to initiate their putative class action after TAG Realty refused to refund their deposit upon the Cromars' direct request. Once

---

In any action brought by the tenant to recover the deposit, the prevailing party shall additionally be entitled to the cost of suit or arbitration including a reasonable attorneys' fee.

[12] The amendments to RCW 59.18.280(2) that have occurred since the Supreme Court's decision in Silver are not relevant to this discussion.

plaintiffs obtained legal representation, TAG Realty later offered to refund only a part of the Cromars' deposit without any acknowledgement of legal fees that they had already incurred. Indeed, the Cromars were correct in their suspicion that TAG Realty's unlawful conduct was not limited to them. Despite its initial opposition to the Cromars' class claims, discovery later revealed that TAG Realty unlawfully withheld the deposits of at least 13 additional tenants. The Cromars were transparent with the trial court that though their suspicions of TAG Realty's repeated unlawful conduct were confirmed, they did not believe the number of identified tenants was large enough to achieve class certification under CR 23.

It is axiomatic that class actions serve a critical function in our legal justice system. E.g., Darling v. Champion Home Builders Co., 96 Wn.2d 701, 706, 638 P.2d 1249 (1982); Chavez v. Our Lady of Lourdes Hosp. at Pasco, 190 Wn.2d 507, 515, 415 P.3d 224 (2018). The objectives of class action suits "include the resolution of many individual claims in a single action and the elimination of the repetitious and possibly inconsistent adjudications involving common questions or similar relief." Darling, 96 Wn.2d at 706. Class actions improve access to the courts by providing affective procedures for wronged individuals who are unable to afford or pursue individual lawsuits to obtain recovery. Id. (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339, 100 S. Ct. 1166, 63 L.Ed.2d 427 (1980)). In addition to resolving individual class members' claims, class actions can also "strongly deter future similar wrongful conduct, which benefits the community as a whole." Scott v. Cingular Wireless, 160 Wn.2d 843, 852, 161 P.3d 1000 (2007), overruled on other grounds as stated in Coneff v. AT&T Corp., 673 F.3d 1155 (9th Cir. 2012).

Here, the trial court's reduction of fees under RCW 59.18.280(2) based on the Cromars' reasonable efforts to investigate and potentially vindicate their and other tenants' rights through a class action defies the statute's purpose to protect tenants' interests and to bolster their position to hold landlords accountable for abuses.

Finally, we observe that the trial court failed to fulfill its obligation to enter findings to support its substantial reduction of the Cromars' requested fees. As referenced above, the court's order provides no explanation as to what tasks are included in the awarded 16 hours as compared to the remaining 36.9 hours the court deemed unreasonable.

In TAG Realty's opposition to the Cromars' attorney fee request, it specifically objected to Anderson's billing of 2.9 hours for drafting emails related to a potential settlement agreement prior to the court's summary judgment order. TAG Realty argued that such work should only account for 0.1 hours. This, again, is work directed to the very settlement the trial court complained the Cromars had failed to achieve. It was TAG Realty that argued that it was unreasonable and a waste of time for the Cromars to spend more than six minutes engaging in settlement communication. TAG Realty cited a copy of Cromars' counsels' time sheet, wherein it highlighted 4.1 hours reported by Anderson, which seems to include the challenged 2.9 hours, and 0.8 hours reported by Santiago that included time spent on settlement discussions.[13] The trial court simply disregarded the record before it in blaming the Cromars for the lack of settlement.

---

[13] The highlighted time records were attached to TAG Realty's counsel's supporting declaration, which stated that "[c]ounsel for Plaintiffs and TAG Realty counsel exchanged several emails and phone calls related to a potential settlement agreement in advance of the Court's ruling on Plaintiffs' Motion for Summary Judgment. Copies of the emails regarding settlement can be provided to the Court upon request."

Even assuming the trial court agreed with TAG Realty's objections and thus subtracted 4 hours of Anderson's work and 0.8 hours of Santiago's work, the lodestar would consist of 11.6 hours for Anderson and 36.5 hours for Santiago. The lodestar calculation at the court-reduced hourly rate would be as follows:

$$(11.6 \text{ hours} \times \$500) + (36.5 \text{ hours} \times \$450) = \$22,225$$

But the trial court awarded a total final fee amount of $7,200, which is more than a 32 percent reduction from the amount that would be awarded at the reduced hourly rate with the reduction in hours proposed by TAG Realty. This ignores any analysis of the time Cromars' counsels actually incurred. Besides the eminently reasonable 8.1 hours devoted to discovery noted above, counsels claimed time meeting with their clients, learning about their problem, drafting the complaint, and then performing tasks that are simply necessary to any lawsuit, such as time to draft a motion for default when TAG Realty refused to answer as was its obligation under CR 8 and CR 12, preparing witness disclosures and the confirmation of joinder that the superior court required by its local rules, drafting a motion for continuance, discussing the case with the client as is required by the Rules of Professional Conduct, filing a motion for summary judgment that was in the end both necessary to obtain TAG Realty's compliance with the law and justified in its entirety. The effect of the trial court's ruling is to warn any would-be tenant's counsel that they need to be able to perform all such litigation in two day's worth of time, or go without compensation.

The trial court's vast reduction of plaintiffs' fees required the court to provide an explanation as to which parts of the lawyer's casework it discounted to arrive at its final numbers and for what reasons. See Peiffer, 6 Wn. App. 2d at 833-34 (holding that trial

court failed to provide adequate explanation for its substantial 32 percent reduction of requested fees). Further, a trial court is required to show how it resolved any disputed issues of fact, and the court's conclusions must explain its analysis. Berryman, 177 Wn. App. at 658. Here, the trial court's order provides no such insight.[14] Instead, the trial court's ruling admonishes the Cromars for pursuing a class action claim and appears to make the sweeping assumption that they could have obtained the same outcome with two day's worth of legal assistance. This was improper. Where a trial court does not develop an adequate record in support of its fee award, remand is required for the trial court to enter proper findings and conclusions.[15] Peiffer, 6 Wn. App. 2d at 833-34; Mayer, 102 Wn. App. at 79 (citing Mahler, 135 Wn.2d at 435).

Accordingly, we partially reverse the trial court's order specific to its determination of reasonable hours and remand for the trial court to reconsider its attorney fee award and enter proper findings and conclusions consistent with this opinion.

Reassignment

We decline plaintiffs' request for this case to be reassigned to a different trial court judge on remand. Reassignment is available only in limited circumstances, such as where the trial judge will exercise discretion on remand regarding the issue that

---

[14] The only specific reference to the record the trial court made in its order is to plaintiffs' summary judgment motion, where plaintiffs stated that they "initially brought this case as a putative class action so that they could conduct discovery and, hopefully, return unlawfully-retained deposits to other former tenants. While – as expected – TAG [Realty] does systematically invoke its illegal deposit forfeiture provisions against other tenants, discovery responses suggest that TAG [Realty]'s business scale is likely not large enough to meet the numerosity requirements of CR 23."

[15] For example, the trial court may prepare a table "that lists, for each attorney, the hours reasonably performed for particular tasks and the rate charged, which may vary with the type of work." Berryman, 177 Wn. App. at 664 (citing Bowers, 100 Wn.2d at 597-98).

triggered the appeal and has apparently prejudged the issue. State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). Plaintiffs do not argue that the trial court judge harbored bias against them. Further, a trial court's legal errors do not warrant reassignment and "even where a trial judge has expressed a strong opinion as to the matter appealed, reassignment is generally not available as an appellate remedy if the appellate court's decision effectively limits the trial court's discretion on remand." State v. McEnroe, 181 Wn.2d 375, 387-88, 333 P.3d 402 (2014).[16]

### Attorney Fees on Appeal

Plaintiffs request attorney fees on appeal under RAP 18.1 and RCW 59.18.280(2). RAP 18.1 allows the award of attorney fees on appeal if authorized by applicable law. RCW 59.18.280(2) provides in relevant part, "In any action brought by the tenant to recover the [security] deposit, the prevailing party shall additionally be entitled to the cost of suit or arbitration including a reasonable attorneys' fee." Because no set of considerations could conceivably justify the award the trial court entered, plaintiffs are the prevailing party in this court and we award them their fees on appeal under RCW 59.18.280(2). A commissioner of this court shall determine the amount of the award. We note that this court is not bound by the trial court's determination of reasonable rates.

We affirm in part, reverse in part, and remand for reconsideration of attorney fees

---

[16] We also decline plaintiffs' request for a commissioner of this court to a determine attorney fees based on proceedings below. Plaintiffs do not provide explanation as to why a commissioner's review of this case is warranted, and the single case they cite is inapposite. See Elliott Bay Adjustment Co., Inc. v. Dacumos, 200 Wn. App. 208, 219, 401 P.3d 473 (2017) (reversing the superior court's order and remanding to the district court for a reasonable attorney fee award).

incurred below consistent with this opinion.[17]

_____ Coburn, J.

WE CONCUR:

_____ Birk, J.          _____ Mann, J.

---

[17] We emphasize that, as we observed in <u>View Ridge Estates Homeowners Ass'n v. Guetter</u>,

> "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." <u>Fox v. Vice</u>, 563 U.S. 826, 838, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011). Indeed, "the determination of fees 'should not result in a second major litigation.'" [<u>Id.</u>] at 838 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). We encourage the trial court and the parties to keep as much in mind on remand.

30 Wn. App. 2d 612, 648-49, 546 P.3d 463, <u>review denied</u>, 554 P.3d 1225 (2024).